UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| TIMOTHY BASSETT, Derivatively on Behalf of MAGNUM HUNTER RESOURCES CORPORATION, | § § § | Case No. |
| | § | |
| Plaintiff, | § § § | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934, |
| v. | § § | BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST |
| GARY C. EVANS, RONALD D. ORMAND, FRED J. SMITH, JR., H.C. FERGUSON, III, JAMES W. DENNY, III, J. RALEIGH BAILES, SR., BRAD BYNUM, STEPHEN C. HURLEY, JOE L. MCCLAUGHERTY, VICTOR G. CARRILLO, STEVEN A. PFEIFER, JEFF SWANSON, and DAVID S. KRUEGER, | § § § § § § § § § § | ENRICHMENT |
| Defendants, | § § § | |
| -and- | § § | |
| MAGNUM HUNTER RESOURCES CORPORATION, a Delaware corporation, | § § § | |
| Nominal Defendant. | § § | |
| | § | DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

Page

I.     NATURE AND SUMMARY OF ACTION..........................................................................1

II.    JURISDICTION AND VENUE .................................................................................................6

III.   PARTIES ................................................................................................................................7

      A.     Plaintiff ........................................................................................................................7

      B.     Nominal Defendant .....................................................................................................8

      C.     Defendants ...................................................................................................................8

IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS .......................................................16

      A.     Fiduciary Duties........................................................................................................16

      B.     Breaches of Duties ....................................................................................................18

      C.     Additional Duties of the Audit Committee Defendants.............................19

V.     CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ..............21

VI.    THE COMPANY'S HISTORY OF WOEFULLY INADEQUATE
      ACCOUNTING CONTROLS ...........................................................................................23

      A.     The Company's Historic Use of Conflicted and Inadequate
            Accounting Services .................................................................................................24

      B.     The Company's Inadequate External Auditing Services...........................26

VII.   THE INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING
      STATEMENTS..................................................................................................................27

VIII.  THE TRUTH IS REVEALED ..........................................................................................51

IX.    REASONS THE STATEMENTS WERE IMPROPER ...................................................58

X.     DAMAGES TO MAGNUM HUNTER CAUSED BY THE INDIVIDUAL
      DEFENDANTS .................................................................................................................59

XI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ......................................60

      A.     Demand Is Excused Because the Director Defendants' Conduct Is
            Not a Valid Exercise of Business Judgment..............................................61

      B.     Demand Is Excused Because Each Member of the Board Faces a
            Substantial Likelihood of Liability for Their Misconduct........................62

XII.    COUNT I - AGAINST THE DIRECTOR DEFENDANTS FOR VIOLATION OF
        SECTION 14(A) OF THE EXCHANGE ACT ...............................................................64

XIII.   COUNT II - AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF
        FIDUCIARY DUTY..............................................................................................................65

XIV.    COUNT III - AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF
        CORPORATE ASSETS .......................................................................................................68

XV.     COUNT IV - AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST
        ENRICHMENT .....................................................................................................................68

XVI.    PRAYER FOR RELIEF ......................................................................................................69

XVII.   JURY DEMAND ...................................................................................................................70

## I.     NATURE AND SUMMARY OF ACTION

1.     This is a shareholder derivative action brought by plaintiff on behalf of nominal defendant Magnum Hunter Resources Corporation ("Magnum Hunter" or the "Company") against the members of its Board of Directors (the "Board") and certain executives at the Company (collectively, the "Individual Defendants").  This action seeks to remedy the Individual Defendants' violations of section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, waste of corporate assets, and unjust enrichment.

2.     Magnum Hunter is an independent exploration and production company engaged in the acquisition, development, and production of crude oil, natural gas and natural gas liquids, primarily in West Virginia, Kentucky, Ohio, Texas, and North Dakota, and in Saskatchewan, Canada.  The current management took over control of the Company in 2009.  Soon thereafter, the Individual Defendants began "to evaluate a number of joint venture and acquisition opportunities … within [Magnum Hunter's] core areas of existing operations."  Making good on their word, the Individual Defendants approved and implemented four major acquisitions in 2011 alone, including the purchase of another drilling company for $320 million, and three land acquisitions valued at more than $72 million.  These four acquisitions increased the Company's assets by 369%, from $249 million in 2010 to over $1.68 billion in 2011.  The Company's expansion plans continued in 2012.  Between February and July 2012, Magnum Hunter acquired two additional companies for a combined purchase price of more than $369 million, and entered into two more land purchase agreements for a total of approximately $28 million.  These acquisitions nearly doubled the Company's assets, with assets reaching more than $2.19 billion for 2012.

3.     As the Company expanded, however, the Individual Defendants failed to implement adequate internal and external financial controls to account for Magnum Hunter's

tremendous growth.  For example, the Company did not have an internal accounting, financial reporting, or auditing staff until at least September 2011.  Further, the Individual Defendants failed to timely engage the services of an external auditor[1] with sufficient resources to adequately perform its duties.  Instead, through the middle of 2012, at the direction of the Individual Defendants, Magnum Hunter retained the services of Hein & Associates, LLP ("Hein"), an external auditor the Individual Defendants chose to replace in July 2012 with another auditing firm "with a greater depth of resources."

4.      In July 2012, the Company retained PricewaterhouseCoopers LLP ("PwC") as its external auditor immediately began discovering material weaknesses at Magnum Hunter that were previously unreported by Hein.  As a result, on November 14, 2012, the Company was forced to restate its second quarter 2012 financial results, which increased Magnum Hunter's quarterly loss reported by more than 94%.  The Company was also forced to disclose on November 14 certain accounting errors and material weaknesses in the Company's internal controls over financial reporting, including that the Company lacked sufficient, qualified personnel to design and manage an effective control environment, and that the Company had ineffective controls over its period-end financial reporting process and share-based compensation.

5.      By February 2013, it became apparent that the Company would be unable to timely file its fiscal year ("FY") 2012 financial statements, which were due the following month.  Thus, on February 28, 2013, the Company was forced to file a notice of late filing for its 2012

---

[1] An external auditor, sometimes referred to as an independent auditor, is a certified public accountant who examines the financial records and business transactions of a company that the external auditor is not affiliated with.  An external auditor is typically used to avoid conflicts of interest and to ensure the integrity of the auditing process.  When an audit is performed, it is the external auditor's job to make sure that records are examined in an honest and forthright manner.

Form 10-K for the year ended December 31, 2012 ("2012 Form 10-K"), which stated that the Company anticipated filing no later than March 18, 2013.  Magnum Hunter blamed the late filing on the transition between Hein and PwC.  PwC's investigation quickly revealed, however, that significant additional material weaknesses within the Company presented much larger problems. In particular, PwC identified numerous issues that PwC believed would likely have a material impact on the fairness or reliability of Magnum Hunter's previously reported consolidated financial reports, and PwC informed Magnum Hunter that such issues would likely require the Company's FY 2012 financial statements to be negatively adjusted.  The issues PwC identified were related to: (i) the valuation of the Company's oil and gas properties; (ii) the calculation of the Company's oil and gas reserves; (iii) the Company's position with respect to certain tax matters; (iv) the Company's accounting of its acquisition of NGAS Resources, Inc.; and (v) the Company's compliance with certain debt covenants.

6.     Unfortunately, when PwC presented the above noted material weaknesses to Magnum Hunter, the Board and Audit Committee simply dismissed the auditing firm.  On April 16, 2013, Magnum Hunter announced PwC's termination, and admitted that PwC identified various material weaknesses at Magnum Hunter.  The announcement, however, failed to disclose certain material information that was brought to the Audit Committee's attention by PwC.  Thus, PwC was forced to write a letter to the U. S. Securities and Exchange Commission ("SEC") on April 18, 2013, disagreeing with a portion of Magnum Hunter's public statement.  PwC stated that "information came to [PwC's] attention that [PwC] concluded materially impacts the fairness or reliability of the Company's consolidated financial statements and this issue was not resolved to our satisfaction prior to [PwC's] dismissal."  Further, as a result of PwC's dismissal, Magnum

Hunter was again forced to push back the filing of its already delayed audited financial statements for FY 2012.

7.      In addition to the above, PwC's audit also revealed that the Company's 2012 proxy statement (the "2012 Proxy") contained false or misleading statements.  Specifically, the Company's 2012 Proxy asked shareholders to vote on an amended and restated stock incentive plan to increase the aggregate number of shares of Magnum Hunter common stock that may be issued under the stock incentive plan.  According to the 2012 Proxy, the increased shares would be used to compensate officers and directors for their performance, which was purportedly based on the Company's performance as a whole.  As revealed by PwC's audit however, Magnum Hunter lacked adequate internal controls over financial reporting to properly assess whether the Company was actually meeting its short and long-term performance goals.  Thus, the Company's misinformed shareholders ultimately voted to approve the amended and restated stock incentive plan on the basis of the inaccurate statements contained in the 2012 Proxy.  More, on the same day that the shareholders approved the plan, the Individual Defendants were collectively awarded 1.42 million options, valued at over $4.58 million as of the grant date.  If the Board had accurately described the Company's compensation plan, namely that compensation was based on goals that Magnum Hunter could not accurately measure, the Company's shareholders would not have approved the plan.

8.      On June 14, 2013, the Company finally filed its long-delayed 2012 Form 10-K with the SEC.  Magnum Hunter was forced to disclose that its new external auditor, BDO USA, LLP ("BDO"), found material weaknesses within the Company that were nearly identical to those initially discovered by PwC prior to PwC's questionable dismissal.  In particular, BDO found that Magnum Hunter lacked an effective control environment to meet the Company's

growth, and found material weaknesses concerning the Company's: (i) financial reporting; (ii) leasehold property costs; (iii) complex accounting issues; and (iv) income taxes. BDO's audit also confirmed that Magnum Hunter lacked adequate internal controls over financial reporting to properly assess whether the Company was actually meeting its short and long-term performance goals, thus confirming that the 2012 Proxy contained false and misleading statements. In addition, the 2012 Form 10-K also revealed that the SEC's Division of Enforcement is currently conducting an inquiry concerning the Company's repeated changes in outside auditors, internal controls, and public statements to investors.

9.      As a result of the Individual Defendants' misconduct detailed above, Magnum Hunter filed numerous documents with the SEC that contained improper statements which did not accurately reflect the Company's financial performance and condition. Indeed, the Individual Defendants' misconduct has forced Magnum Hunter to: (i) file multiple "corrections" to its filings made with the SEC; (ii) restate its second quarter 2012 financial results in October 2012 to increase its quarterly loss reported by more than 94% and disclose defects in its internal controls that it intentionally understated; and (iii) take an untimely $65 million impairment charge in December 2012. Moreover, based on PwC's findings and the SEC inquiry, it appears likely that the Company may be forced to take at least another $71 million in impairment charges related to unproved reserves and property impairments, and ultimately may be required to restate several quarters of financial statements that its previous auditor opined as accurate.

10.      The Individual Defendants also repeatedly and inaccurately reported that the Company had sufficient internal controls and procedures relating to its accounting systems. In contrast, as detailed herein, the truth was that the Individual Defendants blatantly failed to implement the requisite financial controls and procedures, and were unable to ensure that the

Company's financial statements were accurate and in accordance with Generally Accepted Accounting Principles ("GAAP").[2]

11.     All told, the Company has paid dearly for the improper conduct of the Individual Defendants.  Within days after the Company's April 16, 2013 corrective disclosure, Magnum Hunter's market capitalization plummeted more than 25%, from $564.4 million to $421.6 million, erasing more than $142.8 million in a few short days.   In total, the Individual Defendants' misconduct has wiped out more than $571.3 million in market capitalization, or 57.54%, from the Company's recent high of $993 million on February 22, 2012.

12.     Further, as a direct result of this unlawful course of conduct, the Company is now the subject of at least six federal securities class action lawsuits filed in the U.S. District Court for the Southern District of Texas and the Southern District of New York on behalf of investors who purchased Magnum Hunter's shares (the "Securities Class Actions").

## II.     JURISDICTION AND VENUE

13.     This Court has jurisdiction in this case over all causes of action asserted herein pursuant to 28 U.S.C. §1332 in that plaintiff is not a citizen of the United States and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court also has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under section 14(a) of

---

[2] Financial statements filed with the SEC are required to be prepared in accordance with GAAP and are the responsibility of the Company.  GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures, which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

the Exchange Act.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Magnum Hunter maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Magnum Hunter occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.   PARTIES

### A.    Plaintiff

16.     Plaintiff Timothy Bassett was a shareholder of Magnum Hunter at the time of the acts complained of, has continuously been a shareholder since that time, and is a current Magnum Hunter shareholder.  Plaintiff is a citizen of Canada.

**B.     Nominal Defendant**

17.     Nominal Defendant Magnum Hunter is an independent oil and gas company engaged in the exploration for and the exploitation, acquisition, development, and production of crude oil, natural gas, and natural gas liquids, primarily in the states of West Virginia, Ohio, Texas, Kentucky, and North Dakota and in Saskatchewan, Canada.  The Company is also engaged in midstream operations involving the gathering of natural gas through its Eureka Hunter Pipeline System.  Magnum Hunter is a Delaware corporation with principal executive offices located at 777 Post Oak Boulevard, Suite 650, Houston, Texas.  Accordingly, Magnum Hunter is a citizen of Delaware and Texas.

**C.     Defendants**

18.     Defendant Gary C. Evans ("Evans") is Magnum Hunter's Chief Executive Officer ("CEO"), Chairman of the Board, and a director and has been since May 2009.  Defendant Evans is also named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Evans knowingly, recklessly, or with gross negligence: (i) failed to implement adequate internal and financial controls at Magnum Hunter; (ii) failed to ensure the Company's financial statements were in accordance with GAAP; (iii) made false or misleading statements in various SEC filings and press releases; and (iv) caused or allowed the Company to file various additional false or misleading SEC filings and press releases.  Moreover, defendant Evans acted with at least negligence in approving the 2012 Proxy tainted by false and misleading statements regarding the shareholder vote to amend and restate the stock incentive plan to improperly compensate himself and other officers and directors.  Magnum Hunter paid defendant Evans the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2012 | $465,000 | - | $2,943,232 | $90,507 | $3,498,739 |
| 2011 | $415,000 | $650,000 | $3,181,100 | $73,129 | $4,319,229 |

Defendant Evans is a citizen of Texas.

19.     Defendant Ronald D. Ormand ("Ormand") is Magnum Hunter's Chief Financial Officer ("CFO"), Executive Vice President, and a director and has been since May 2009. Defendant Ormand is also named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.   Defendant Ormand knowingly, recklessly, or with gross negligence: (i) failed to implement adequate internal and financial controls at Magnum Hunter; (ii) failed to ensure the Company's financial statements were in accordance with GAAP; (iii) made false or misleading statements in various SEC filings; and (iv) caused or allowed the Company to file various additional false or misleading SEC filings and press releases.  Moreover, defendant Ormand acted with at least negligence in approving the 2012 Proxy tainted by false and misleading statements regarding the shareholder vote to amend and restate the stock incentive plan to improperly compensate himself and other officers and directors.  Magnum Hunter paid defendant Ormand the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2012 | $275,000 | - | $981,077 | $28,057 | $1,284,134 |
| 2011 | $250,000 | $240,625 | $1,223,500 | $36,966 | $1,751,091 |

Defendant Ormand is a citizen of Texas.

20.     Defendant Fred J. Smith, Jr. ("Smith") is Magnum Hunter's Senior Vice President of Accounting and Chief Accounting Officer and has been since October 2012.  Defendant Smith is also named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.   Defendant Smith knowingly, recklessly, or with gross

negligence: (i) failed to implement adequate internal and financial controls at Magnum Hunter; (ii) failed to ensure the Company's financial statements were in accordance with GAAP; (iii) made false or misleading statements in various SEC filings; and (iv) caused or allowed the Company to file various additional false or misleading SEC filings and press releases. Defendant Smith is a citizen of Texas.

21.     Defendant H.C. Ferguson, III ("Ferguson") is a Magnum Hunter Executive Vice President and has been since October 2009 and President of Magnum Hunter's Eagle Ford Shale Division and has been since May 2011.  Defendant Ferguson is also named as a defendant in a securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Ferguson knowingly, recklessly, or with gross negligence: (i) failed to implement adequate internal and financial controls at Magnum Hunter; (ii) failed to ensure the Company's financial statements were in accordance with GAAP; and (iii) caused or allowed the Company to file various additional false or misleading SEC filings and press releases.  Magnum Hunter paid defendant Ferguson the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2012 | $275,000 | - | $981,077 | $27,199 | $1,283,276 |
| 2011 | $250,000 | $240,625 | $1,223,500 | $36,324 | $1,750,449 |

Defendant Ferguson is a citizen of Texas.

22.     Defendant James W. Denny, III ("Denny") is a Magnum Hunter Executive Vice President and has been since March 2008 and President of Magnum Hunter's Appalachian Division and has been since May 2011.  Defendant Denny is also named as a defendant in a securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Denny knowingly, recklessly, or with gross negligence: (i) failed to implement adequate internal and financial controls at Magnum Hunter; (ii) failed to ensure the

Company's financial statements were in accordance with GAAP; and (iii) caused or allowed the Company to file various additional false or misleading SEC filings and press releases.  Magnum Hunter paid defendant Denny the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2012 | $275,000 | - | $981,077 | $61,454 | $1,317,531 |
| 2011 | $250,000 | $240,625 | $1,223,500 | $68,981 | $1,783,106 |

Defendant Denny is a citizen of Texas.

23.     Defendant J. Raleigh Bailes, Sr. ("Bailes") is a Magnum Hunter director and has been since 2006.  Defendant Bailes is also Chairman of Magnum Hunter's Audit Committee and has been since least April 2011.   Defendant Bailes knowingly or recklessly: (i) failed to implement adequate internal and financial controls at Magnum Hunter; (ii) failed to ensure the Company timely engaged the services of an external auditor with enough resources to keep up with the Company's tremendous growth; (iii) failed to ensure the Company's financial statements were in accordance with GAAP; (iv) made false or misleading statements in various SEC filings; (v) caused or allowed the Company to file various additional false or misleading SEC filings and press releases; and (vi) improperly dismissed PwC before it could complete its audit of the Company's financials.  Moreover, defendant Bailes acted with at least negligence in approving the 2012 Proxy tainted by false and misleading statements regarding the shareholder vote to amend and restate the stock incentive plan to improperly compensate himself and other officers and directors.  Magnum Hunter paid defendant Bailes the following compensation as a director:

| Fiscal Year | Option Awards | Stock Awards | Total |
|---|---|---|---|
| 2012 | $178,817 | $43,766 | $222,583 |
| 2011 | $154,173 | $36,495 | $190,668 |

Defendant Bailes is a citizen of Texas.

24.     Defendant Brad Bynum ("Bynum") is a Magnum Hunter director and has been since 2006.  Defendant Bynum was also a member of Magnum Hunter's Audit Committee from at least April 2011 to at least November 2012.  Defendant Bynum knowingly or recklessly: (i) failed to implement adequate internal and financial controls at Magnum Hunter; (ii) failed to ensure the Company timely engaged the services of an external auditor with enough resources to keep up with the Company's tremendous growth; (iii) failed to ensure the Company's financial statements were in accordance with GAAP; (iv) made false or misleading statements in various SEC filings; (v) caused or allowed the Company to file various additional false or misleading SEC filings and press releases; and (vi) improperly dismissed PwC before it could complete its audit of the Company's financials.  Moreover, defendant Bynum acted with at least negligence in approving the 2012 Proxy tainted by false and misleading statements regarding the shareholder vote to amend and restate the stock incentive plan to improperly compensate himself and other officers and directors.  Magnum Hunter paid defendant Bynum the following compensation as a director:

| Fiscal Year | Option Awards | Stock Awards | Total |
|---|---|---|---|
| 2012 | $178,817 | $49,854 | $228,671 |
| 2011 | $154,173 | $45,501 | $199,674 |

Defendant Bynum is a citizen of Texas.

25.     Defendant Stephen C. Hurley ("Hurley") is a Magnum Hunter director and has been since October 2011.  Defendant Hurley is also a member of Magnum Hunter's Audit Committee and has been since December 2011.  Defendant Hurley knowingly or recklessly: (i) failed to implement adequate internal and financial controls at Magnum Hunter; (ii) failed to ensure the Company timely engaged the services of an external auditor with enough resources to keep up with the Company's tremendous growth; (iii) failed to ensure the Company's financial

statements were in accordance with GAAP; (iv) made false or misleading statements in various SEC filings; (v) caused or allowed the Company to file various additional false or misleading SEC filings and press releases; and (vi) improperly dismissed PwC before it could complete its audit of the Company's financials.  Moreover, defendant Hurley acted with at least negligence in approving the 2012 Proxy tainted by false and misleading statements regarding the shareholder vote to amend and restate the stock incentive plan to improperly compensate himself and other officers and directors.  Magnum Hunter paid defendant Hurley the following compensation as a director:

| Fiscal Year | Option Awards | Stock Awards | Total |
|---|---|---|---|
| 2012 | $178,817 | $45,549 | $224,366 |
| 2011 | $67,516 | $2,998 | $70,514 |

Defendant Hurley is a citizen of Texas.

26.     Defendant Joe L. McClaugherty ("McClaugherty") is a Magnum Hunter director and has been since 2006.  Defendant McClaugherty is also a member of Magnum Hunter's Audit Committee and has been since at least April 2011.  Defendant McClaugherty knowingly or recklessly: (i) failed to implement adequate internal and financial controls at Magnum Hunter; (ii) failed to ensure the Company timely engaged the services of an external auditor with enough resources to keep up with the Company's tremendous growth; (iii) failed to ensure the Company's financial statements were in accordance with GAAP; (iv) made false or misleading statements in various SEC filings; (v) caused or allowed the Company to file various additional false or misleading SEC filings and press releases; and (vi) improperly dismissed PwC before it could complete its audit of the Company's financials.  Moreover, defendant McClaugherty acted with at least negligence in approving the 2012 Proxy tainted by false and misleading statements regarding the shareholder vote to amend and restate the stock incentive plan to improperly

compensate himself and other officers and directors.   Magnum Hunter paid defendant McClaugherty the following compensation as a director:

| Fiscal Year | Option Awards | Stock Awards | Total |
|---|---|---|---|
| 2012 | $178,817 | $55,367 | $234,184 |
| 2011 | $154,173 | $52,003 | $206,176 |

Defendant McClaugherty is a citizen of New Mexico.

27.     Defendant Victor G. Carrillo ("Carrillo") is a Magnum Hunter director and has been since January 2011.  Defendant Carrillo knowingly or recklessly: (i) failed to implement adequate internal and financial controls at Magnum Hunter; (ii) failed to ensure the Company timely engaged the services of an external auditor with enough resources to keep up with the Company's tremendous growth; (iii) failed to ensure the Company's financial statements were in accordance with GAAP; (iv) made false or misleading statements in various SEC filings; (v) caused or allowed the Company to file various additional false or misleading SEC filings and press releases; and (vi) improperly dismissed PwC before it could complete its audit of the Company's financials.  Moreover, defendant Carrillo acted with at least negligence in approving the 2012 Proxy tainted by false and misleading statements regarding the shareholder vote to amend and restate the stock incentive plan to improperly compensate himself and other officers and directors.  Magnum Hunter paid defendant Carrillo the following compensation as a director:

| Fiscal Year | Option Awards | Stock Awards | Total |
|---|---|---|---|
| 2012 | $178,817 | $40,079 | $218,896 |
| 2011 | $291,122 | $18,003 | $309,125 |

Defendant Carrillo is a citizen of Texas.

28.     Defendant Steven A. Pfeifer ("Pfeifer") is a Magnum Hunter director and has been since May 2006.  Defendant Pfeifer knowingly or recklessly: (i) failed to implement adequate internal and financial controls at Magnum Hunter; (ii) failed to ensure the Company

timely engaged the services of an external auditor with enough resources to keep up with the Company's tremendous growth; (iii) failed to ensure the Company's financial statements were in accordance with GAAP; (iv) made false or misleading statements in various SEC filings; (v) caused or allowed the Company to file various additional false or misleading SEC filings and press releases; and (vi) improperly dismissed PwC before it could complete its audit of the Company's financials.  Moreover, defendant Pfeifer acted with at least negligence in approving the 2012 Proxy tainted by false and misleading statements regarding the shareholder vote to amend and restate the stock incentive plan to improperly compensate himself and other officers and directors.  Magnum Hunter paid defendant Pfeifer the following compensation as a director:

| Fiscal Year | Option Awards | Stock Awards | Total |
|---|---|---|---|
| 2012 | $178,817 | $26,841 | $205,658 |
| 2011 | $154,173 | $32,501 | $186,674 |

Defendant Pfeifer is a citizen of Texas.

29.     Defendant Jeff Swanson ("Swanson") is a Magnum Hunter director and has been since 2009.  Defendant Swanson knowingly or recklessly: (i) failed to implement adequate internal and financial controls at Magnum Hunter; (ii) failed to ensure the Company timely engaged the services of an external auditor with enough resources to keep up with the Company's tremendous growth; (iii) failed to ensure the Company's financial statements were in accordance with GAAP; (iv) made false or misleading statements in various SEC filings; (v) caused or allowed the Company to file various additional false or misleading SEC filings and press releases; and (vi) improperly dismissed PwC before it could complete its audit of the Company's financials.  Moreover, defendant Swanson acted with at least negligence in approving the 2012 Proxy tainted by false and misleading statements regarding the shareholder vote to amend and

restate the stock incentive plan to improperly compensate himself and other officers and directors.  Magnum Hunter paid defendant Swanson the following compensation as a director:

| Fiscal Year | Option Awards | Stock Awards | Total |
|---|---|---|---|
| 2012 | $178,817 | $37,998 | $216,815 |
| 2011 | $154,173 | $30,507 | $184,680 |

Defendant Swanson is a citizen of Texas.

30.     Defendant David S. Krueger ("Krueger") was Magnum Hunter's Senior Vice President from October 2009 to December 2012 and Chief Accounting Officer from October 2009 to October 2012.  Defendant Krueger is also named as a defendant in securities class action complaints that allege he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  Defendant Krueger knowingly or recklessly: (i) failed to implement adequate internal and financial controls at Magnum Hunter; (ii) failed to ensure the Company's financial statements were in accordance with GAAP; and (iii) caused or allowed the Company to file various additional false or misleading SEC filings and press releases.  Defendant Krueger is a citizen of Texas.

31.     The defendants identified in ¶¶18-22, 30 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶18-19, 23-29 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶23-26 are referred to herein as the "Audit Committee Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     Fiduciary Duties

32.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Magnum Hunter and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to

control and manage Magnum Hunter in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Magnum Hunter and not in furtherance of their personal interest or benefit.

33.     To discharge their duties, the officers and directors of Magnum Hunter were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Magnum Hunter were required to, among other things:

(a)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(b)     ensure that the Company complied with its legal obligations and requirements, including complying with regulatory requirements and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     remain informed as to how Magnum Hunter conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

34.     Each officer and director of the Company owes to Magnum Hunter and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

### B.     Breaches of Duties

35.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Magnum Hunter, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

36.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to operate without adequate internal and financial controls.  The Individual Defendants also breached their fiduciary duty of loyalty by allowing defendants to cause, or by themselves causing, the dissemination of SEC filings and public statements which they knew or were reckless in not knowing contained improper statements and omissions, including with respect to the Company's financial controls and business prospects.

37.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Magnum Hunter, were able to and did, directly or indirectly, exercise

control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Magnum Hunter has expended, and will continue to expend, significant sums of money.

### C.  Additional Duties of the Audit Committee Defendants

38.  In addition to these duties, under its Charter in effect since at least September 2011, the Audit Committee Defendants, defendants Bailes, Bynum, Hurley, and McClaugherty owed specific duties to Magnum Hunter to review the effectiveness of the independent audit effort, review significant accounting principles, and assist the Board in overseeing, among other things: (i) the integrity of the financial statements of the Company; (ii) the effectiveness of the external auditors; (iii) the Company's compliance with legal, regulatory, and ethical requirements; and (iv) the Company's system of internal controls and procedures, including disclosure controls and procedures.  The Audit Committee's Charter provides in relevant part:

> To fulfill its responsibilities and duties, the Committee shall:
>
> 1.  Review annually this Committee Charter for adequacy and recommend any changes to the Board.
>
> 2.  Review the significant accounting principles, policies and practices followed by the Company in accounting for and reporting its financial results of operations in accordance with generally accepted accounting principles ("GAAP").
>
> 3.  Review the financial, investment and risk management policies followed by the Company in operating its business activities.
>
> 4.  Review the Company's annual audited financial statements, related disclosures, including the MD&A portion of the Company's filings, and discuss with the independent accountants the matters required to be discussed by Auditing Standard No. 61, including (a) the quality as well as acceptability of the accounting principles applied in the financial statements, and (b) new or changed accounting policies; significant estimates, judgments, uncertainties or unusual transactions; and accounting policies relating to significant financial statement items.

5. Review any management letters or internal control reports prepared by the independent accountants or the Company's internal auditors and responses to prior management letters, and review with the independent accountants the Company's internal financial controls, including the budget, staffing and responsibilities of the Company's financial and accounting staff.

6. Review the effectiveness of the independent audit effort, including approval of the scope of, and fees charged in connection with, the annual audit, quarterly reviews and any non-audit services being provided.

7. Be directly responsible for the appointment, determination of the compensation for, retention and oversight of the work of the independent accountant employed to conduct the audit (including resolution of disagreements between the independent accountants and management regarding financial reporting) or other audit, review or attest services. The independent accountants shall report directly to the Committee.

* * *

10. Obtain on an annual basis a formal written statement from the independent accountants delineating all relationships between the accountants and the Company consistent with Independence Standards Board Standard No. 1, and review and discuss with the accountants any disclosed relationships or services the accountants have with the Company that may affect the accountants' independence and objectivity. The Committee is responsible for taking, or recommending that the full Board take, appropriate action to oversee the independence of the independent accountants.

11. For each of the first three fiscal quarters and at year end, at a Committee meeting review with management the financial results, the proposed earnings press release and formal guidance that the Company may plan to offer, and review with the independent accountants the results of their review of the interim financial information and audit of the annual financial statements.

12. Review management's analysis of any significant accounting issues, changes, estimates, judgments or unusual items relating to the financial statements and the selection, application and effects of critical accounting policies applied by the Company (including an analysis of the effect of alternative GAAP methods) and review with the independent accountants the reports on such subjects delivered pursuant to Section 10A(k) of the Exchange Act and the rules and regulations promulgated thereunder by the SEC.

* * *

14. Engage and determine funding for such independent professional advisers and counsel as the Committee determines are appropriate to carry out its functions hereunder. The Company shall provide appropriate funding to the Committee, as determined by the Committee, for payment of (1) compensation to the

independent accountants for services approved by the Committee, (2) compensation to any outside advisers retained by the Committee, and (3) ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

15. Report to the Board on a regular basis on the major events covered by the Committee and make recommendations to the Board and management concerning these matters.

* * *

17. Approve all related party transactions, as defined by applicable AMEX Rules, to which the Company is a party.

39.    Despite these additional duties, defendants Bailes, Bynum, Hurley, and McClaugherty wholly abdicated their responsibilities to the Company and its shareholders by allowing the Company to issue improper statements, failing to ensure that reliable systems of controls were implemented and functioning effectively to prevent the Company from issuing improper statements, failing to ensure the Company retained the services of adequate internal and external auditing and accounting, and failing to ensure the Company's compliance with applicable laws and regulations.

## V.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

41.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Magnum Hunter, regarding the Individual Defendants' management of Magnum Hunter's operations and the Company's business, financial

performance, and prospects; and (ii) enhance the Individual Defendants' executive and directorial positions at Magnum Hunter and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

42.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

43.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

44.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

45.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## VI.   THE COMPANY'S HISTORY OF WOEFULLY INADEQUATE ACCOUNTING CONTROLS

46.     Magnum Hunter is an independent exploration and production company engaged in the acquisition, development, and production of crude oil, natural gas, and natural gas liquids, primarily in West Virginia, Kentucky, Ohio, Texas, and North Dakota, and in Saskatchewan, Canada. The Company is active in five of the most prolific unconventional shale resource plays in North America, namely the Marcellus Shale, Utica Shale, Eagle Ford Shale, Pearsall Shale, and Williston Basin/Bakken Shale.

47.     In 2009, the current management took control of Magnum Hunter.  By November 2010, the Company announced plans "to evaluate a number of joint venture and acquisition opportunities … within [its] core areas of existing operations."  Soon thereafter, Magnum Hunter began purchasing land and acquiring numerous companies, along with their operations, while at the same time failing to ensure adequate internal and external financial controls were implemented to keep pace with the Company's tremendous growth.

48.     On February 18, 2011, defendant Evans boasted in a conference call to investors that "growth [was] going to be substantial for 2011."  Indeed, from 2010 to 2011, the Company's assets increased by 369%, from $249 million to over $1.68 billion, as a result of four major acquisitions announced in 2011.  The acquisitions included the purchase of another drilling company for $320 million, and three land acquisitions valued at more than $72 million.  The Company's revenues and capital expenditures also significantly increased in 2011, with revenues reaching more than $113 million (an increase of 287% from the previous year), and capital expenditures soaring to $291.9 million (an increase of 264% from the previous year).

49.     The Company kept this growing along this breakneck pace in 2012.  Between February and July 2012, Magnum Hunter acquired two additional companies for a combined

purchase price of more than $369 million, and also entered into two more land purchase agreements for a total of approximately $28 million.  These acquisitions nearly doubled the Company's assets, with assets reaching more than $2.19 billion for 2012.

50.     In spite of the anticipated, planned, and actual growth at Magnum Hunter in 2011 and 2012, the Individual Defendants utterly failed to ensure adequate internal and external financial controls were implemented to keep pace with the Company's rapidly expanding accounting and auditing needs.  As detailed below, the Company did not have an internal accounting, financial reporting, or auditing staff until at least September 2011.  Further, through the middle of 2012, the Individual Defendants utterly failed to engage the services of an external auditor with sufficient resources to adequately fulfill its auditing duties.

**A.     The Company's Historic Use of Conflicted and Inadequate Accounting Services**

51.     From at least 2009, when the current management team took over, through September 30, 2011, the Company operated without an internal accounting staff.  Instead, during that time, the Company exclusively relied on accounting services provided by GreenHunter Energy, Inc. ("GreenHunter"), another publicly-traded energy company that was founded by defendant Evans, who is GreenHunter's majority shareholder and also serves as Chairman and CEO.  GreenHunter is also closely affiliated with other top executives at Magnum Hunter, including defendants Ormand and Krueger, who served respectively as a director and CFO of GreenHunter.

52.     In addition to having an unqualified and unsophisticated accounting staff, various conflicts prevented GreenHunter from providing adequate accounting services to Magnum Hunter, including the fact that GreenHunter was controlled by Magnum Hunter's CEO.  As a

result of the close relationship between GreenHunter and Magnum Hunter, from October 2011 and April 2012, Magnum Hunter or its subsidiaries:

(a)     purchased an office building from GreenHunter for $1.7 million, obtaining a $1.4 million loan from GreenHunter in connection with the process (a portion of the loan was guaranteed by defendant Evans);

(b)     rented storage tanks and other equipment from GreenHunter totaling $1.3 million;

(c)     sold all of its equity interest in one of its subsidiaries to a wholly owned subsidiary of GreenHunter's for $8.8 million;

(d)     entered into drilling contracts with a wholly owned subsidiary of GreenHunter for a drilling fee of $155,000 per well; and

(e)     entered into an eight year water hauling and disposal agreement with GreenHunter that could pay GreenHunter up to $5 million.

53.     In addition to the above, during 2010 and 2011, while the Company did not have its own internal accounting, Magnum Hunter was providing certain undisclosed accounting services to GreenHunter.   Thus, for approximately two years, GreenHunter was providing "internal" accounting services to Magnum Hunter, while Magnum Hunter was providing various undisclosed accounting services to GreenHunter.   Magnum Hunter continued to provide accounting services to GreenHunter through at least December 31, 2012.

54.     Unsurprisingly, GreenHunter's 2012 Form 10-K recently revealed that as of December 31, 2012, GreenHunter's disclosure controls and procedures were not effective due to material weaknesses strikingly similar to those that long plagued Magnum Hunter.   These material weaknesses include: (i) a lack of sufficient, qualified personnel with the appropriate

level of accounting knowledge, experience, and training in GAAP to assess the completeness and accuracy of GreenHunter's accounting matters; (ii) ineffective controls over the period-end financial reporting process, including controls with respect to the preparation, review, supervision, and monitoring of accounting operations; and (iii) insufficient segregation of duties and insufficient controls that would mitigate conflicting roles within the control environment to prevent material misstatements.

### B.    The Company's Inadequate External Auditing Services

55.    Compounding the Company's problem of having no internal accounting, shortly after the current management took over, the Board retained an external auditor that ultimately was unable to keep up with the Company's tremendous asset growth.  In particular, in October 2009, the Audit Committee engaged Hein as its external auditor, the same external auditor that has long been used by GreenHunter.  Despite the Company's explosive growth in 2011 and 2012, the Individual Defendants retained the services of Hein through July 2012.  As the Company later admitted, Hein lacked the necessary resources to continue to adequately fulfill its external audit duties commensurate with the Company's growth.  Indeed, Magnum Hunter was forced to restate at least one quarterly financial report that Hein previously opined as accurate.  Further, the most recent Public Company Accounting Oversight Board ("PCAOB") review of Hein found that several of Hein's audits were inadequate because the firm failed to obtain sufficient appropriate evidence to form an opinion on the financial statements and internal controls of the companies that it was auditing. [3]

---

[3] As a result of the Sarbanes-Oxley Act of 2002 ("SOX"), Congress established the PCAOB to oversee the audits of all public companies.  The PCAOB oversees the auditors of public companies by conducting inspections on the auditing firms and issuing Auditing Standards that provide guidance on how to conduct an effective audit on a public company.  To achieve that goal, PCAOB inspections include reviews of certain aspects of selected audits performed by the

## VII.   THE INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING STATEMENTS

56.   On February 29, 2012, Magnum Hunter issued a press release announcing its fourth quarter and FY 2011 financial results for the interim period ending December 31, 2011, entitled "Magnum Hunter Reports Financial Results for the Fourth Quarter of 2011 and Fiscal Year End 2011."   The press release touted the Company's 404% revenue growth, from $9.7 million to $49.1 million, and improved operating margins for the fourth quarter 2011.   The press release further praised FY 2011 revenue growth of 295%, from $32.7 million to $129.2 million, and 354% daily production increase, from 1,301 to 5,510 barrels of oil equivalent ("Boe") per day.   Defendant Evans further boasted that daily production would continue to increase and that the Company's returns on capital will remain at superior levels.   The press release, however, failed to disclose that Magnum Hunter's internal controls were severely inadequate, and thus the Company's financial statements were unreliable.   In relevant part, the press release stated:

**Management Comments**

Mr. Gary C. Evans, Chairman of the Board and Chief Executive Officer of Magnum Hunter Resources, commented, "Calendar year 2011 was a transitional period for Magnum Hunter. During the first half of the year, we successfully closed on a number of acquisitions that provided the foundation from which we are growing our daily production and proved reserves today. During the second half of the year, we completed the integration of approximately $590 million in transactions and began our 'harvesting' mode of exploiting the tremendous leasehold acreage positions covering these unconventional resource plays. ***Our year-end production success which is continuing into the first quarter of 2012, has given us the confidence to increase our projected exit rate on daily production a third time to 16,000 Boe per day by year-end.*** At the same time, we continue reducing our cost structure both in the field and at our corporate offices which will enable us to report much wider margins of cash flow available for reinvestment. Because we are in control of approximately 75% of our core properties as an operator, we have the flexibility to move our capital program

firm and reviews of other matters related to the firm's quality control system.   The PCAOB report on Hein is available at PCAOB Release No. 104-2012-078, available at http://pcaobus.org/Inspections/Reports/Documents/2012_Hein_Associates_LLP.pdf.

around and reallocate among our two oil plays (Bakken and Eagle Ford) while the energy industry deals with an unprecedented glut of natural gas. ***This will ensure that our returns on capital deployed in 2012 remain at superior levels.*** Our management team continues to make operating improvements in the field which is resulting in production levels that exceed our prior expectations."

57.     Also on February 29, 2012, Magnum Hunter filed its Annual Report on Form 10-K with the SEC for the fiscal year ended December 31, 2011 ("2011 Form 10-K").  The 2011 Form 10-K further detailed the Company's fourth quarter and FY 2011 financial results and was signed by defendants Evans, Ormand, Krueger, Bailes, Bynum, Carrillo, Hurley, McClaugherty, Pfeifer, and Swanson.  The Board stated that the effectiveness of the Company's internal controls over financial reporting was audited by Hein, but did not disclose that Hein lacked the resources to adequately keep pace with the Company's substantial growth.  Further, the Board noted that defendants Evans and Ormand had concluded that the Company's internal controls over financial reporting were effective to provide reasonable assurance regarding the reliability of Magnum Hunter's financial reporting and the preparation of the Company's financial statements for external purposes in accordance with GAAP.  In relevant part, the 2011 Form 10-K stated:

**Evaluation of Disclosure Controls and Procedures**

As of the end of the period covered by this report, an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) was performed under the supervision and with the participation of the Company's management, including our Chief Executive Officer and Chief Financial Officer. ***Based on that evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of December 31, 2011 to ensure: that information required to be disclosed in the reports it files and submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms; and that information that is required to be disclosed under the Exchange Act is accumulated and communicated to the Company's management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure***.

**Evaluation of Changes in Internal Control over Financial Reporting**

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we have determined that, during the fourth quarter of fiscal 2011, there were no changes in our internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

**Management's Annual Report on Internal Controls Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act.   Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we assessed the effectiveness of our internal controls over financial reporting as of the end of the period covered by this report based on the framework in "Internal Control—Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission.   *Based on that assessment, our Chief Executive Officer and Chief Financial Officer concluded that our internal controls over financial reporting were effective as of December 31, 2011 to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of our financial statements for external purposes in accordance with U.S. generally accepted accounting principles*.

The Company acquired Williston Hunter Canada, Inc., Williston Hunter, Inc., and Magnum Hunter Production, Inc. during fiscal 2011.  As permitted by SEC guidance, management excluded the acquired companies from its assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2011.  Williston Hunter Canada, Inc., Williston Hunter Inc., and Magnum Hunter Production, Inc. are wholly owned subsidiaries whose total assets and net income represent approximately 34% and 35%, respectively, of the related consolidated financial statement amounts as of and for the year ended December 31, 2011.

The effectiveness of the Company's internal controls over financial reporting as of December 31, 2011, has been audited by Hein & Associates, LLP, an independent registered public accounting firm, as stated in their attestation report which is included in Item 8, "Financial Statements and Supplementary Data."

58.    The truthfulness of the 2011 Form 10-K was also specifically certified by

defendants Evans and Ormand pursuant to the SOX.  In particular, two certificates were attached

to the 2011 Form 10-K, signed by both defendants Evans and Ormand, certifying that:

1.      I have reviewed this annual report on Form 10-K of the Company;

2.      Based on my knowledge, *this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are *responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have*:

> a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> b)      Designed *such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

> c)      *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*; and

> d)      *Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting*; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      ***All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

59.      On March 30, 2012, Magnum Hunter closed the purchase of certain assets from Eagle Operating, Inc.  The purchase was paid for, in part, with 296,859 shares of Magnum Hunter restricted common stock valued at $2 million.  On April 5, 2012, the Company filed an Automatic Shelf Registration Statement on Form S-3 with the SEC to register those shares for resale on the open market.  That registration statement, signed by defendants Evans, Ormand, Krueger, Bailes, Bynum, Carrillo, Hurley, McClaugherty, Pfeifer, and Swanson, was false and misleading, again stating that the Company had internal controls sufficient to permit it to accurately assess and report its assets, expenses, and earnings, and that Magnum Hunter's financial results were reported in compliance with GAAP.  As a result, the registration statement overstated Magnum Hunter's business and financial metrics.

60.      On May 3, 2012, Magnum Hunter issued a press release entitled "Magnum Hunter Reports Financial Results for the First Quarter of 2012."  The press release stated that revenues increased 293%, earnings before interest, taxes, depreciation, amortization, and exploration expenses ("EBITDAX") increased 425%, and production increased 380%. Despite a lack of adequate internal controls with respect to the Company's reserve calculations, defendant Evans expressed excitement that "[w]ell results in all three of our shale plays are outperforming our third party engineering production type curves which gives us ***increased confidence that proved reserves companywide continue to be understated***."

61.     On the same day, the Company filed a Quarterly Report on Form 10-Q with the SEC for the first quarter period ended March 31, 2012.   The Form 10-Q was signed by defendants Evans and Ormand and again stated that the Company maintained adequate and effective internal controls.  The Form 10-Q also included certifications by defendants Evans and Ormand that were substantially similar to the certifications attached to the 2011 Form 10-K.   The Form 10-Q stated in relevant part:

**Evaluation of disclosure controls and procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports we file under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.  Such controls include those designed to ensure that information for disclosure is accumulated and communicated to management, including the Chairman and the Chief Executive Officer ("CEO") and the Chief Financial Officer ("CFO"), as appropriate, to allow timely decisions regarding required disclosure.

Our management, with the participation of our CEO and CFO, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of March 31, 2012. Based on this evaluation, the CEO and CFO have concluded that, as of March 31, 2012, our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (2) accumulated and communicated to our management, including our CEO and CFO, as appropriate to allow timely decisions regarding required disclosure.

**Internal control over financial reporting**

There were no changes made in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the three months ended March 31, 2012, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

62.     On June 1, 2012, the Company filed a Current Report on Form 8-K with the SEC. The Form 8-K noted that the Audit Committee "initially selected and engaged [Hein] as the Company's independent registered public accountants for fiscal 2012."   The Form 8-K also

effectively admitted that Hein lacked the necessary resources to adequately fulfill its external audit duties commensurate with the Company's explosive growth, stating that senior management of the Company recently "concluded that it would be in the Company's best interest for the Company to engage a new independent registered public accounting firm for 2012 *with a greater depth of resources*…."  The Form 8-K further noted that Audit Committee had directed the Company's senior management to seek a replacement.

63.    On July 16, 2012, Magnum Hunter issued a press release entitled "Magnum Hunter Resources Announces Mid-Year Total Proved Oil & Gas Reserves."  The press release stated that the Company had total proved reserves of 67.7 million Boe, that proved reserves were up 51% from year-end 2011, and that the present value was up 55% from year-end 2011.  Despite the fact that the Company's internal controls over such valuations were inadequate, the press release included purported details concerning the Company's estimated total proved reserves at June 30, 2012, and also provided, an estimate of the resource potential associated with its existing undeveloped mineral lease acreage position in the Company's four shale plays.

64.    On July 19, 2012, the Company filed a Current Report on Form 8-K with the SEC.  The Form 8-K noted that on July 17, 2012, PwC replaced Hein as the Company's independent auditor for FY 2012.

65.    On August 9, 2012, Magnum Hunter issued a press release entitled "Magnum Hunter Reports Financial Results for the Second Quarter of 2012 and Six Months Ended June 30, 2012."  Without adequate evidence to support various financial findings, the press release touted a 104% increase in revenues, a record high pro forma adjusted EBITDA of $41.1 million for second quarter of 2012, a 162% increase in average production rate from second quarter of 2011, and a borrowing base increase of 22% from $212.5 million to $260 million.  Defendant Evans

also boasted that Magnum Hunter was sufficiently funded to meet all of its capital needs for the foreseeable future.  Defendant Evans stated in relevant part, as follows:

**Management Comments**

Mr. Gary C. Evans, Chairman of the Board and Chief Executive Officer of Magnum Hunter Resources, commented, "Financial results for the second quarter and first half of 2012 reflect consistent growth in production, revenues and cash flow.  At the same time, maintaining cost control has been paramount and our substantial reduction in lease operating expenses and general and administrative expenses per barrel of oil equivalent produced continues to decline.  This allows the cash margin expansion that we have been experiencing each quarter over the past year.  Our leasehold acreage position in all five of our shale plays continues to expand, most notably in the Williston Basin and the Eagle Ford, our two oil plays.  As crude oil prices have moved back well north of $90.00 per barrel, we continue to increase our commodity hedge position to safe guard future volatility and insure cash flow down the road.  With over $255 million of current and available liquidity, we are sufficiently funded to meet all our capital needs for the foreseeable future."

66.     The same day, the Company filed a Quarterly Report on Form 10-Q with the SEC for the second quarter period ended June 30, 2012.  The Form 10-Q, signed by defendants Evans and Ormand, made similar representations to other Forms 10-Q concerning the Company's purportedly adequate controls and procedures, and attached SOX certifications substantially similar to those described above.

67.     On September 7, 2012, Magnum Hunter announced that it had priced an underwritten public offering of 1,050,000 shares of 8% Series D cumulative preferred stock.  The accompanying registration statement contained false and misleading statements that the Company had internal controls sufficient to permit it to accurately assess and report its assets, expenses, and earnings, and that that the Company's financial results were reported in compliance with GAAP.  The registration statement further incorporated by reference previously filed quarterly financial statements that the Company was later forced to restate due to

inaccuracies.   The registration statement therefore overstated Magnum Hunter's business and financial metrics.

68.     On October 22, 2012, Magnum Hunter filed a Current Report on Form 8-K with the SEC.  The Form 8-K announced that the Company's second quarter 2012 Form 10-Q, filed just two months prior, should no longer be relied upon because the Company discovered errors related to its computation of non-cash share-based, compensation expense relating to common stock options granted to employees by the Board's Compensation Committee during the second quarter of 2012.  The error caused the Company's non-cash share-based, compensation expense to be understated by approximately $3.8 million.  The Form 8-K also stated that management of the Company and the Audit Committee discussed the understatement with both PwC and Hein.  In addition the Form 8-K disclosed that management had concluded that the Company's disclosure controls and procedures were not effective due to a material weakness in the accounting for share-based compensation expense.   Nonetheless, the Form 8-K falsely reassured investors that Magnum Hunter had both identified and corrected any defects in its internal controls.  In addressing the impact of the earnings restatement and a purported assessment of the Company's then-present internal controls, the Form 8-K stated in relevant part:

> Our management, including the CEO and CFO, has evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2012.   Based on this evaluation, *management has concluded that our disclosure controls and procedures were not effective due to a material weakness in the accounting for share-based compensation expense.  We did not effectively review supporting documentation* for the journal entry for share-based compensation as necessary to properly state non-cash share-based compensation expense on the published financial statements of operations.  *New procedures and controls are being implemented to ensure that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is (1) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (2) accumulated and communicated to our management, including our CEO and CFO, as appropriate to allow timely decisions regarding required disclosure.*  The following are the principal items in

the Financial Statements affected by the non-cash compensation expense understatement of $3.8 million:

- General and administrative expense for the three and six month periods ended June 30, 2012 should have been $16,440,000 and $31,639,000, respectively, rather than $12,592,000 and $27,791,000, respectively, as previously reported.  This represents an increase of $3,848,000 or 30.6% and 13.9% for these periods, respectively.

- Net loss attributable to common shareholders for the three and six month periods ended June 30, 2012 should have been ($18,463,000) and ($35,515,000), respectively, rather than ($14,615,000) and ($31,667,000), respectively, as previously reported.  This represents an increase of $3,848,000 or 26.3% and 12.1% for these periods, respectively.

- Net loss per common share for the three and six month periods ended June 30, 2012 should have been ($0.12) and ($0.25), respectively, rather than ($0.10) and ($0.22), respectively, as previously reported.

These changes in general and administrative expense, net loss attributable to common shareholders and net loss per common share will be properly reflected in the Company's future filings with the Securities and  Exchange Commission, as applicable, including an amendment to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2012.  None of these changes has any effect on the Company's compliance with its existing debt covenants or in calculations of the Company's EBITDAX.

*In light of the material weakness in the accounting for share-based compensation expense, we have performed and implemented additional new procedures, which include the utilization of new and more experienced personnel to review share-based compensation expense and completing the implementation of software to track such expenses in order to further strengthen this internal control*.

69.     On October 23, 2012, the Company appointed defendant Smith in defendant Krueger's place as Senior Vice President of Accounting and Chief Accounting Officer.

70.     On November 9, 2012, the Company filed a Notification of Late Filing on Form NT 10-Q with the SEC.  The Form NT 10-Q notified the SEC that Company was unable to make a timely filing of its restated second quarter 2012 Form 10-Q.  In relevant part, the Form NT 10-Q stated that because:

The Company [was] working diligently to complete the Restatement, evaluating identified control deficiencies and the closing and reporting process, including completing and providing the necessary information to its newly appointed Independent Auditors for them to complete their review[,]… [t]he Company [was] unable to complete the Restatement process, evaluate its conclusions regarding internal controls, and file its Quarterly Report on Form 10-Q … for the period ended September 30, 2012 on or before the prescribed due date....

71.    Despite the Company's inability to file a timely restatement of its second quarter 2012 Form 10-Q, on November 13, 2012, Magnum Hunter issued a press release touting increases to the Company's revenues, borrowing base, and current net production.   The press release, entitled "Magnum Hunter Reports Financial Results for the Third Quarter of 2012 and Nine Months Ended September 30, 2012," stated in relevant part:

**Financial Results for the Three Months Ended September 30, 2012**

Magnum Hunter reported an increase in total revenues of 149% to $69.8 million for the three months ended September 30, 2012, compared to $28.1 million for the three months ended September 30, 2011.   Operating margins also improved significantly as lease operating expenses per barrel of oil equivalent ("Boe") declined approximately 30% from $15.55 per Boe to $10.95 per Boe, primarily due to the addition of new unconventional production and tighter controls on field operating expenses.   Recurring cash general and administrative costs per Boe also declined approximately 48% from $15.36 to $8.15 per Boe (see Non-GAAP Financial Measures and Reconciliations below).

The Company reported a net loss of $42.3 million or ($0.25) per basic and diluted common shares outstanding for the three months ended September 30, 2012, compared to a net loss of $2.0 million, or ($0.02) per basic and diluted common shares outstanding for the three months ended September 30, 2011.   The Company's net loss per share for the three months ended September 30, 2012, was ($0.08) per basic and diluted common shares outstanding when adjusted for non-cash and non-recurring expenses of $28.2 million (see Non-GAAP Financial Measures and Reconciliations below).

For the three months ended September 30, 2012, Magnum Hunter's 'Adjusted Earnings Before Interest, Income Taxes, Depreciation and Amortization' ("Adjusted EBITDA") was $40.6 million or $0.24 per basic and diluted common share outstanding.   This represents a 290% increase over the Adjusted EBITDA of $10.4 million for the three months ended September 30, 2011 (see Non-GAAP Financial Measures and Reconciliations below).

*   *   *

- 37 -

**Borrowing Base Increase**

Magnum Hunter also announced today that the Company's borrowing base under its $750 million Senior Revolving Credit Facility has been increased by $115 million from $260 million to $375 million. ***This 44% increase in the Company's borrowing base is primarily attributable to organic growth of the Company's existing proved reserve base in its core operating regions***. As of November 12, 2012, Magnum Hunter had total liquidity of approximately $150 million, including cash and availability under the Company's Senior Revolving Credit Facility. In addition, under the Company's market registration statement to issue and sell Series D Preferred Stock, subject to market conditions, the Company currently has the ability to issue up to an additional $80 million of Series D Preferred Stock (non-convertible).

**Management Comments**

Mr. Gary C. Evans, Chairman of the Board and Chief Executive Officer of Magnum Hunter Resources, commented, "Our efforts to build the foundation necessary for a significant unconventional resource company continued during the third quarter of 2012. Our production growth, reserve growth and resulting cash flow growth are further substantiated by the recent $115 million increase in the Company's bank borrowing capacity. Our Appalachia Division has been crippled all year due to the combination of lower natural gas prices, limited midstream take away capacity, and no gas processing infrastructure for liquids extraction. All of these issues have been worked on throughout the year and are close to being resolved, which now positions this division for explosive growth into next year. ***The Company's Board of Directors and management recognize the huge disparity between our current equity valuation and our real asset value. Since we are forced to operate in a "show-me" market as opposed to the historical "tell-me" market, we have taken the appropriate steps to begin realizing the true value of some of our unconventional assets. Once realized, this will be a tremendous benefit for our long term and dedicated shareholders."***

72.    On November 14, 2012, the Company filed its restated second quarter 2012 Form 10-Q/A which increased its quarterly loss reported by more than 94%. The restated Form 10-Q/A also noted that in October and November 2012, the Company disclosed various accounting errors and identified material weaknesses in its internal controls over financial reporting in connection with: (i) a lack of sufficient qualified personnel to design and manage an effective control environment; (ii) the Company's period-end financial reporting process; and (iii) the Company's share-based compensation. The Form 10-Q/A nonetheless attempted to falsely

reassure investors that Magnum Hunter had both identified and corrected any defects in its internal controls, stating that the Company had hired new personnel, realigned the responsibilities and accountability in the financial reporting process, and implemented additional monitoring and detective controls to remediate the material weakness in period-end financial reporting processes.  The restated Form 10-Q/A stated in relevant part:

**Item 4. Controls and procedures.**

**Restatement of Previously Issued Financial Statements**

On October 12, 2012, management ("we") of Magnum Hunter Resources Corporation (the "Company") identified an error in the calculation of non-cash share-based compensation expense relating to common stock options granted to employees by the Compensation Committee during the second quarter of fiscal year 2012.  The non-cash share-based compensation expense was understated due to the misapplication of the vesting schedule of such options (specifically, the Company's calculations did not take into account that 25% of such options were immediately exercisable on the date of grant).  The error affected our previously issued financial statements contained in the Company's Quarterly Report on Form 10-Q, as filed with the Securities and Exchange Commission ("SEC") on August 9, 2012 (the "Affected Filing").  The misstatement understated general and administrative expenses, net loss attributable to common shareholders and net loss by approximately $3.8 million for the three and six month periods ended June 30, 2012.  The error also affected our disclosures regarding share-based compensation expense for the three and six month periods ended June 30, 2012.  As a result, the Company filed a Form 8-K on October 22, 2012 stating  that the previously issued financial statements contained in the Affected Filing should no longer be relied upon and filed this restated Form 10-Q/A for the three and six month periods ended June 30, 2012 (the "Restated Financial Statements").

*In addition, we identified an error during November 2012 in the accounting treatment and reporting of a financing transaction completed in March 2012 for the sale of Series A Convertible Preferred Units of our majority owned subsidiary, Eureka Hunter Holdings, LLC ("Eureka Hunter") which resulted in the understatement of commodity and preferred stock embedded derivative liabilities of $44.1 million, an overstatement of series A convertible preferred units of Eureka Hunter of $44.3 million and an overstatement of gain on derivatives of $3.6 million and $1.4 million for the three and six month periods ended June 30, 2012, respectively and a misstatement of the related disclosures. The amounts and disclosures as included in the Affected Filing were also corrected in the Restated Financial Statements as described in Note 2 to the Restated Financial Statements contained herein.*

**Evaluation of disclosure controls and procedures**

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that information required to be disclosed in the reports we file under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.  Such controls include those designed to provide reasonable assurance that information for disclosure is accumulated and communicated to management, including the Chairman and Chief Executive Officer ("CEO") and the Chief Financial Officer ("CFO"), as appropriate, to allow timely decisions regarding required disclosure.

Our management, with the participation of our CEO and CFO, has re-evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of June 30, 2012.  *Based on this evaluation, our CEO and CFO have concluded that, as of June 30, 2012, our disclosure controls and procedures were not effective due to the material weaknesses described below*.

To address the material weaknesses described in this Item 4, we performed additional analyses and other post-closing procedures designed to provide reasonable assurance that our consolidated financial statements were prepared in accordance with generally accepted accounting principles in the United States of America ("US GAAP").  *As a result of these procedures, we believe that the consolidated financial statements included in this report fairly present, in all material respects, our financial condition, results of operations, changes in stockholders' equity and cash flows for the periods presented, in conformity with US GAAP*.

\* \* \*

**Material Weaknesses**

A material weakness is a control deficiency, or a combination of control deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

*In connection with the restatements and audit adjustments identified, management identified the material weaknesses described below*.

*Lack of sufficient, qualified personnel to design and manage an effective control environment.  We did not design an effective control environment with the sufficient complement of personnel with the appropriate level of accounting knowledge, experience, and training in US GAAP to assess the completeness and accuracy of the accounting for complex accounting matters, principally related to equity instruments including convertible preferred stock and related arrangements.  This material weakness resulted in the restatement of our Series*

*A convertible preferred units of Eureka Hunter, our commodity and preferred stock embedded derivative liabilities and our loss on derivatives and related disclosures for the three and six month periods ended June 30, 2012 discussed above and resulted in audit adjustments to our consolidated financial statements for the three and six month periods ended June 30, 2012.  This material weakness also contributed to the material weaknesses described below*.

*Period-end financial reporting process.  We did not maintain effective controls over the period-end financial reporting process, including controls with respect to the preparation, review, supervision, and monitoring of accounting operations.  Specifically, we did not maintain effective controls to provide reasonable assurance that monthly account reconciliations were reviewed on a timely basis and that monthly and quarterly financial information was prepared and reviewed timely.  This material weakness resulted in audit adjustments to our Restated Financial Statements for the three and six month periods ended June 30, 2012*.

*Share-based compensation.  We did not design effective controls over share-based compensation expense, which is recorded in our general and administrative expenses.  Specifically, we did not design effective controls related to the review of supporting details, including the completeness and accuracy of the vesting schedule and the journal entries for share-based compensation expenses.  This control deficiency resulted in a misstatement of our general and administrative expense and share-based compensation related disclosures for the three and six month periods ended June 30, 2012 and resulted in the restatement discussed above*.

Additionally, the material weaknesses described above could result in misstatements that would result in a material misstatement of the consolidated financial statements in a future annual or interim period that would not be prevented or detected.

### Changes in Internal Control over Financial Reporting

Except for the material weaknesses discussed above and the remediation plans executed as of June 30, 2012 as noted below, there were no changes made in our internal control over financial reporting (as defined in Rule 13a-15 (f) under the Exchange Act) during the three months ended June 30, 2012, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### Remediation Plans

*We have initiated several steps and plan to continue to implement measures designed to improve our internal control over financial reporting and disclosure controls and procedures in order to remediate the material weaknesses, noted specifically above*.

*To remediate the material weakness in our control environment, we have implemented management changes to establish an environment necessary to prevent or detect potential deficiencies in the preparation of our financial statements and controls to support our desired internal control over financial reporting and disclosure controls and procedures. On October 23, 2012, we hired a new Chief Accounting Officer with the appropriate knowledge and experience to establish and maintain our desired control environment. We will implement more formalized processes and controls to identify, review and document accounting treatment of complex capital-raising instruments. To implement these processes and controls related to the complete and timely evaluation of technical accounting issues, we will continue to add staff and/or seek assistance from outside consultants, as warranted. Accordingly, we are in the process of expanding our accounting department to respond to the recent growth of the Company. These additions include an Assistant Controller hired in July, 2012, Division Controller hired in November, 2012, and Internal Audit Manager hired in August, 2012 and other accounting personnel are being recruited for additional positions. We believe that the personnel we have recently added and that we plan to add, in combination with the other initiatives explained herein, will enable us to improve the scope and quality of our internal review of complex technical accounting matters and financial reporting and remediate this material weakness as well as aid in the remediation of the other two material weaknesses identified*.

*We are realigning the responsibilities and accountability in the financial reporting process and implementing additional monitoring and detective controls to remediate the material weakness in period-end financial reporting processes*. These additional controls include: checklists to ensure appropriate reviews of reconciliations are performed on a timely basis and a financial close timetable and reporting calendar by department that will be monitored by the Chief Accounting Officer to ensure these reviews are completed on timely basis to allow sufficient time for review by management and permit the timely preparation and review of monthly and quarterly financial statements.

We plan to implement additional review controls and other controls with regard to share-based compensation activity around the completeness and accuracy of the schedules and related inputs including reviewer checklists to ensure all inputs and calculations are complete and accurate. We are in the process of implementing these controls and will rely on the controls while we continue to implement a new software system to track stock option activity and the related compensation expense and disclosures.

*We believe the foregoing efforts will effectively remediate the material weaknesses. As we continue to evaluate and work to improve our internal control over financial reporting, we may execute additional measures to address potential control deficiencies or modify the remediation plan described above*.

73.     Also on November 14, 2012, the Company disclosed in its Current Report on Form 8-K filed with the SEC that the Company had failed to hold an annual meeting of shareholders since October 27, 2010, and had already pushed out the date of the 2012 annual meeting of shareholders several times during fiscal 2012.  The Company apparently skipped its fiscal 2011 annual meeting of shareholders altogether.  The Company further noted that it was again pushing out the 2012 annual meeting of shareholders (then scheduled for December 20, 2012) to sometime in January 2013.  The Form 8-K further explained that, "[o]n November 2, 2012, the SEC notified the Company that the SEC will be reviewing the Company's Preliminary Proxy Statement, which was filed with the SEC on October 26, 2012," and that "[t]he Company [would] address the SEC's comments to the Preliminary Proxy Statement, if any, once received."

74.     The following day, on November 15, 2012, the Company filed its Quarterly Report on Form 10-Q with the SEC for the third quarter period ending September 30, 2012.  The Form 10-Q reiterated that as of September 30, 2012, the Company's disclosure controls and procedures were not effective due to material weaknesses, including lack of sufficient qualified personnel to design and manage an effective control environment, weaknesses in the Company's period-end financial reporting process, and ineffective controls over share-based compensation expense.  Again the Company attempted to assuage investor fears, noting that the Company had implemented management changes to establish an environment necessary to prevent or detect potential deficiencies in the preparation of its financial statements and controls to support Magnum Hunter's desired internal control over financial reporting and disclosure controls and procedures.  The Form 10-Q went on to summarize the other management changes as detailed in its restated second quarter 2012 Form 10-Q/A above.

75.     Both the restated second quarter 2012 Form 10-Q/A and the third quarter 2012 Form 10-Q attached SOX certifications similar to those detailed above, and both were signed by defendants Evans and Ormand.

76.     On November 28, 2012, Magnum Hunter filed its 2012 Proxy on Form DEF 14A with the SEC announcing a January 17, 2013 annual shareholder meeting.  The 2012 Proxy noted that shareholders would be asked to vote on an amended and restated stock incentive plan to increase the aggregate number of shares of Magnum Hunter common stock that may be issued under the stock incentive plan by 7.5 million shares.  The 2012 Proxy further stated that the increased number of shares would be used to compensate officers and directors for their performance based on performance objectives of the Company as a whole.  Short-term incentives included goals based on: (i) achieving specified levels of volume weighted average stock price; (ii) achieving specified levels of production; (iii) achieving specified levels of reserves; and (iv) operational performance objectives.  Long-term incentives included goals based on sustained improvements in the Company's financial performance and increases in the value of the Company's common stock over an extended period.  Performance stock awards included goals based on a wide range of financial measures, including, but not limited to: (i) asset measures, including with respect to growth and reserves; (ii) net income measures; (iii) stock price measures; (iv) cash flow measures; (v) return measures; (vi) operating measures; (vii) expense measures; and (viii) relative performance measures.  In particular, the 2012 Proxy stated that:

Short-Term Incentives

Our short-term incentive program, which we refer to in this proxy statement as the Executive Bonus Program, provides an annual cash and/or stock award that is *designed to link each employee's annual compensation to the achievement of annual performance objectives for the Company*, as well as to recognize the employee's performance during the year. The target for each employee is expressed as a percentage of base salary earned during the year and classified as a bonus. Generally, a portion of this award is based upon short-term goals and the

remaining portion of the bonus is based upon the discretion of the Compensation Committee. The Compensation Committee retains the ability to exercise discretion in determining all payments under the Executive Bonus Program.

Each year, the Compensation Committee establishes and approves the specific performance objectives after reviewing the performance achieved by our executives the previous year. Performance objectives are based on Company financial and operational factors determined to be critical to achieving our desired business plans.

\* \* \*

***Performance objectives for the [bonuses] are generally based on performance objectives for the Company as a whole***. Examples of performance objectives include (1) achieving specified levels of volume weighted average stock price, (2) achieving specified levels of production, (3) achieving specified levels of reserves, and (4) operational performance objectives.

\* \* \*

Long-Term Incentives

Our Stock Incentive Plan, in which each of our executive officers, including each of our NEOs, and certain other employees participate, is designed to ***reward participants for sustained improvements in the Company's financial performance and increases in the value of our common stock over an extended period***. Long-term incentives are a key component of the Company's overall compensation structure.

\* \* \*

**Reasons for the Stock Incentive Plan Amendment**

\* \* \*

Our Board believes that increasing the aggregate number of shares of our common stock issuable under the Stock Incentive Plan as contemplated by this amendment is necessary to facilitate the Company's anticipated future growth by enabling it to attract and retain qualified employees, officers and directors through equity participation in the Company. Our Board believes that equity compensation is the most effective means of creating a long-term link between performance and the compensation provided to executives and key employees. Equity grants are also an important element in attracting and retaining employees. Given the intense competition for talented individuals, the Company's ability to offer competitive compensation packages, including those with equity-based incentives is particularly important. Our Board believes that a proportionate increase in the number of shares that can be granted to an individual in a given year is needed to ensure that long-term awards reflect the growth of the Company.

* * *

*Performance Stock Awards*

* * *

The performance measures that may be used under the Stock Incentive Plan include: (a) net income measures (including but not limited to earnings, net earnings, operating earnings, earnings before taxes, EBIT (earnings before interest and taxes), EBITA (earnings before interest, taxes, and amortization) EBITDA (earnings before interest, taxes, depreciation, and amortization), and earnings per share); (b) stock price measures (including but not limited to growth measures and total stockholder return (stock price plus reinvested dividends) relative to a defined comparison group or target and price-earnings multiples); (c) cash flow measures (including but not limited to net cash flow, net cash flow before financing activities, economic value added (or equivalent metric), debt reduction, debt to equity ratio, or establishment or material modification of a credit facility); (d) return measures (including but not limited to return on equity, return on average assets, return on capital, risk-adjusted return on capital, return on investors' capital and return on average equity); (e) operating measures (including operating income, funds from operations, cash from operations, after-tax operating income, sales volumes, production volumes, and production efficiency); (f) expense measures (including but not limited to finding, development, and lifting costs, overhead cost and general and administrative expense); (g) asset measures (including but not limited to a specified target, or target growth in gas, oil, or mineral reserves or gas, oil, or mineral reserves per share, reserve additions, reserve replacement ratio, market capitalization or market value, proceeds from dispositions, strategic acquisitions, or raising capital); (h) relative performance measures (including, but not limited to, relative performance to a comparison group or index designated by the Compensation Committee or market share); (i) corporate values measures (including but not limited to ethics, environmental, legal, regulatory, and safety); (j) in general, performance based awards that would qualify for exemption from the deduction limitations of Section 162(m) of the Code for up to five years before stockholder reapproval would be needed; and (k) any combination of the above. These performance criteria can be included as criteria in the grant of any type of award under the Stock Incentive Plan other than unrestricted stock awards.

The 2012 Proxy, however, failed to disclose that the Company lacked adequate internal controls to properly assess whether the officers, directors, or other employees were meeting their short and long-term performance goals because Magnum Hunter lacked adequate internal controls to determine the Company's actual financial metrics or its performance as a whole, as evidenced by the reportable events that were revealed by PwC and confirmed by BDO.  As a result, the

Company's shareholders were misinformed and ultimately voted to approve the amended and restated stock incentive plan on the basis of the inaccurate statements contained in the 2012 Proxy.

77.    Between December 4, 2012 and January 23, 2013, the Company filed several additional registration statements in connection with various stock offerings.   Each of the registration statements were false and misleading because they stated the Company had internal controls sufficient to permit it to accurately assess and report its assets, expenses, and earnings, and that the Company's financial results were reported in compliance with GAAP.   As a result each registration statement overstated Magnum Hunter's business and financial metrics.

78.    On December 31, 2012, Magnum Hunter filed a Current Report on Form 8-K with the SEC disclosing that the Company's stock was at risk of being delisted.   In particular the Form 8-K stated that the Company had been notified by the New York Stock Exchange ("NYSE") on October 16, 2012, that if the Company did not hold its annual shareholder meeting on January 17, 2013, the Company would be at risk of violating section 302.00 of the NYSE's listing standards, which requires listed companies to hold an annual shareholders' meeting during each fiscal year.

79.    On January 17, 2013, Magnum Hunter's 2012 annual shareholder meeting finally went forward.   Among other things, the shareholders approved the amendment to the incentive plan, which increased the aggregate number of Magnum Hunter shares that may be issued to the Company's officers and directors by 7.5 million shares.   The same day, the Individual Defendants were collectively awarded 1.42 million options, valued at more than $4.58 million as of the grant date.   The following chart summarizes the options granted to the Individual Defendants on January 17, 2013:

| Individual | Date Granted | Options Awarded | Value[A] |
|---|---|---|---|
| Evans, Gary C. | 1/17/2013 | 750,000 | 2,437,500 |
| Ormand, Ronald D. | 1/17/2013 | 250,000 | 800,000 |
| Bailes, J. Raleigh Sr. | 1/17/2013 | 60,000 | 192,000 |
| Bynum, Brad | 1/17/2013 | 60,000 | 192,000 |
| Hurley, Stephen C. | 1/17/2013 | 60,000 | 192,000 |
| McClaugherty, Joe L. | 1/17/2013 | 60,000 | 192,000 |
| Carrillo, Victor G. | 1/17/2013 | 60,000 | 192,000 |
| Pfeifer, Steven A. | 1/17/2013 | 60,000 | 192,000 |
| Swanson, Jeff | 1/17/2013 | 60,000 | 192,000 |
| | Totals | 1,420,000 | $   4,581,500 |
| | | | |
| (A) Value as of 01/17/2013 computed using Black Scholes Model | | | |

80.     On February 28, 2013, the Company filed a Notification of Late Filing on Form NT 10-K to notify the SEC that its 2012 Form 10-K would be filed late.  The Company blamed the late filing on the transition of its outside auditors from Hein to PwC, which purportedly diverted the Company's resources, thus leaving Magnum Hunter unable to compile all information necessary to timely prepare and file its 2012 Form 10-K.  The Form NT 10-K further stated that the Company anticipated that it would file its 2012 Form 10-K no later than March 18, 2013.  In relevant part, the Form NT 10-K stated:

> As previously disclosed in filings with the Securities and Exchange Commission (the "SEC"), in October and November 2012, Magnum Hunter Resources Corporation (the "Company") identified material weaknesses in its internal controls over financial reporting in connection with its (i) lack of sufficient qualified personnel to design and manage an effective control environment, (ii) period-end financial reporting process and (iii) share-based compensation.  The Company devoted substantial time and effort to correcting the previously-filed financial statements and information that were impacted by these material weaknesses.  Further, the Company implemented, and continues to implement, measures that it believes will effectively address these weaknesses in the future.  ***The implementation of these measures has entailed the substantial efforts of accounting staff and the use of external resources.***  Additionally, the Company has devoted significant resources to preparing financial statements and information relating to the Company and its subsidiaries for inclusion in the exchange offer for Senior Notes contemplated by the Company's Registration

Statement on Form S-4, which was declared effective by the SEC on February 7, 2013.

The change in the Company's independent auditors, which occurred in July 2012, has resulted in a normal transition between accounting firms that has required the Company to devote more resources to this transition. ***Therefore, additional internal controls and significant review of certain financial matters were required by the new auditors***.

The diversion of these resources has caused the Company to be unable to compile all information necessary to prepare and file its Annual Report on Form 10-K for the year ended December 31, 2012 within the prescribed period (on or before March 1, 2013) without unreasonable effort or expense. ***The Company anticipates that it will file its Annual Report on Form 10-K no later than March 18, 2013***.

Despite the above, the Company did not file its 2012 Form 10-K until June 14, 2013.

81.    On March 18, 2013, Magnum Hunter issued a press release entitled "Magnum Hunter Provides Update on Status of Annual Report on Form 10-K and Selected Unaudited Financial and Operating Data for the Three Months and Twelve Months Ended December 31, 2012."  The press release disclosed that the Company was having trouble keeping up with the accounting and operational challenges resulting from its rapid growth over the past two years, and that Magnum Hunter's internal control defects had not been remedied as previously stated. The press release, however, concealed that: (i) the Company and PwC were in disagreement over several aspects of the Company's accounting practices; (ii) that PwC was unwilling to sign off on Magnum Hunter's 2012 financial report; and (iii) that the Company's prior financial reports did not fairly represent the Company's actual financial results.  The press release stated in relevant part:

As previously disclosed, Magnum Hunter identified certain material weaknesses in its internal controls over financial reporting in connection with its (i) lack of sufficient qualified personnel to design and manage an effective control environment, (ii) period-end financial reporting processes and (iii) share-based compensation.  Magnum Hunter has implemented, and continues to implement, measures to address these weaknesses in the future.  These measures have included the employment of a significant number of more experienced accounting

personnel, including the addition of the following new personnel: a chief accounting officer, a head of financial reporting, a head of internal audit, a head of tax, two Company controllers, and two regional controllers.  In addition, Magnum Hunter is utilizing third party technical resources, including consultants and professional advisory firms, to assist in the implementation of these measures. Magnum Hunter also intends to implement a new integrated accounting and land information system during fiscal year 2013.   The Company may identify additional material weaknesses as it finalizes its financial statements for fiscal 2012 and, if so, it will take appropriate measures to address any such weaknesses.

*The Company's rapid growth, particularly during the last 24 months, has resulted in complex and challenging accounting issues and operational integration matters that have required a significant amount of time and human resources in order to complete the fiscal 2012 audit.   Magnum Hunter continues to work diligently with PricewaterhouseCoopers LLP, its independent auditors, to provide all the necessary information, including the finalization of all adjustments and supporting analysis, so they can complete the audit of the Company's financial statements for the fiscal year ended December 31, 2012 as promptly as possible.   At this time, Magnum Hunter is not aware of any disagreements with its auditors regarding the Company's fiscal 2012 financial statements*.  In addition, the Company has not discovered any material errors or omissions that would require a restatement of its previously issued unaudited 2012 quarterly financial information.

Magnum Hunter expects to obtain the necessary consents from its lenders under the Company's senior credit facility to allow the Company to provide its 2012 audited consolidated financial statements at a later date, and also expects to obtain similar consents from the lenders under Eureka Hunter Pipeline, LLC's credit facilities.  In addition, Magnum Hunter intends to take the appropriate action to prevent or cure any default under the Company's senior notes indenture resulting from its failure to timely file this audited financial information.

82.    In addition to the above, the March 18, 2013 press release contained guidance for the Company's fiscal 2012 financial results, as well as certain "Selected Unaudited Financial and Operating Data for the Three Months and Twelve Months Ended December 31, 2012." Specifically, the release stated that 2012 revenues had increased by 141% to $274 million, oil and gas production had increased 139% to 4,800 million Boe, oil and gas average daily production had increased 140% to 5,511 Boe per day, and that adjusted EBITDAX had increased 217% to 160 million.  The press release further stated that the Company anticipated non-cash charges for impairment to its unproved properties, but failed to disclose that PwC did not agree

with the Company's anticipated results.  With respect to the impairment charge being taken, the press release stated in relevant part:

### Liquidity, Anticipated Impairment Charges And Dividends

The Company had liquidity of approximately $100 million as of March 15, 2013. The Company believes it has sufficient liquidity and projected cash flow from operations to fund its projected fiscal 2013 upstream capital budget of $300 million, absent any contemplated asset sales.  The Company is continuing to aggressively pursue planned monetizations of certain of its properties, including its Eagle Ford Shale properties, to further enhance its liquidity, and the Company expects to announce the results of such activities in the near future.

***The Company anticipates non-cash charges for impairment to its unproved properties and proved properties of approximately $49 million and approximately $16 million, respectively, in the three months ended December 31, 2012.  As a result, the Company expects non-cash charges for impairment to its unproved properties and proved properties of approximately $55 million and approximately $16 million, respectively, in the twelve months ended December 31, 2012.  The Company is reviewing whether additional impairment charges will be required.***  None of the expected impairment charges relate to the Company's Eagle Ford Shale properties, and any additional non-cash impairment charges that may be identified are not expected to relate to such properties.

## VIII.   THE TRUTH IS REVEALED

83.    On April 16, 2013, less than a month after issuing the March 18, 2013 press release which stated that the Company was unaware of any disagreements with its auditors regarding the Company's fiscal 2012 financial statements, the Company filed a Current Report on Form 8-K with the SEC disclosing numerous potential material weaknesses identified by PwC.  In particular, the Form 8-K disclosed that PwC had identified numerous issues that, if PwC had been allowed to investigate prior to dismissal, may have had a material impact on the fairness or reliability of Magnum Hunter's previously reported consolidated financial reports. These significant issues related to: (1) the valuation of the Company's oil and gas properties; (2) the calculation of the Company's oil and gas reserves; (3) the Company's position with respect to certain tax matters; (4) the Company's accounting of its acquisition of NGAS Resources, Inc.;

and (5) the Company's compliance with certain debt covenants. The Form 8-K also disclosed that on April 10, 2013, at the direction of the Audit Committee, Magnum Hunter dismissed PwC as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2012, effective immediately. The decision to dismiss PwC was unanimously ratified and approved by the Board.

84. PwC's auditing services also revealed that the Company's 2012 Proxy contained false or misleading information. In particular, the 2012 Proxy asked shareholders to vote on an amended and restated stock incentive plan to increase the aggregate number of shares of Magnum Hunter common stock that may be issued under the stock incentive plan to compensate officers and directors for their performance. According to the 2012 Proxy, the compensation was purportedly to be based on various financial goals and other performance metrics, including, in particular, the Company's performance as a whole. However, as revealed by PwC's incomplete audit and later confirmed by BDO's audit, the Company lacked adequate internal controls to properly assess whether the Company was meeting its financial goals, thus rendering the above statements in the 2012 Proxy false and misleading. Nonetheless, on the same day that Magnum Hunter's shareholders approved the amended and restated stock incentive plan on the basis of inaccurate or misleading information, the Individual Defendants collectively were awarded 1.42 million options, valued at over $4.58 million as of the grant date.

85. In addition to the above, the April 16, 2013 Form 8-K stated that that during the course of PwC's engagement as the Company's independent auditor, there were purportedly no "reportable events" as that term is defined in Item 304(a)(1)(v) of Regulation S-K under the Securities Act of 1933 relating to PwC's engagement as the Company's independent registered public accounting firm, except that: (i) PwC advised the Company of issues that may have a

material impact on the fairness or reliability of the Company's consolidated financial statements; (ii) PwC was not allowed to further investigate and resolve such issues to PwC's satisfaction prior to dismissal; (iii) the PwC needed to significantly expand the scope of its audit but did not complete its expanded procedures prior to dismissal; and (iv) the Company had certain deficiencies in its internal controls over financial reporting that constitute material weaknesses during PwC's engagement, which led PwC to believe that internal controls necessary for the Company to develop reliable financial statements did not exist.  As detailed below, PwC later revealed that the Company failed to disclose certain additional reportable events that PwC deemed material.  More, despite the above, the Form 8-K stated that "the Company believes that it has implemented the internal controls and processes necessary to develop reliable financial statements and allow its successor independent accounting firm to complete the audit of the Company's consolidated financial statements for the fiscal year ended December 31, 2012."  The Form 8-K went on to state that the Company was effectively shopping for a more favorable audit opinion and would be working with its successor independent accounting firm to complete the audit of such consolidated financial statements.

86.    On this news, the Company's market capitalization plummeted from more than $564.4 million on April 16, 2012, to approximately $481.1 million the following day, erasing more than $83.3 million (roughly 14.8%) in market capitalization overnight.

87.    On April 22, 2013, Magnum Hunter was forced to disclose in an amended Form 8-K that PwC disagreed with Magnum Hunter's characterization of their parting.  In particular, the amended Form 8-K disclosed that on April 18, 2013, PwC sent a letter to Magnum Hunter and the SEC stating that PwC did "not agree with the [Company's] statements concerning" whether there had been any "reportable events" relating to PwC's engagement as the Company's

independent registered public accounting firm.  Specifically, PwC noted that Company's description of reportable events failed to "indicate that [PwC] advised the Company that information came to [its] attention that [PwC] *concluded materially impacts the fairness or reliability of the Company's consolidated financial statements and this issue was not resolved to [PwC's] satisfaction prior to [its] dismissal....*"  More, PwC noted that it "believe[d] the discussion of the material weaknesses relating to the 'control environment' should also include a discussion of controls over the review of third parties related to key areas affecting the control environment."  Finally, PwC noted that the Form 8-K failed to disclose that it "advised the Company that [PwC] believe[s] the Company needs to evaluate the impact of 'tone at the top' on the control environment."

88.     On this news, the Company's market capitalization shed another $25.5 million to close at approximately $421.6 million on April 23, 2013.  Between April 16, 2013 and April 23, 2013, the Company's market capitalization deflated by over 25%, erasing more than $142.8 million in market capitalization in a few days.

89.     On June 14, 2013, Magnum Hunter finally filed its delayed 2012 Form 10-K with the SEC.  The 2012 Form 10-K revealed that like PwC, the Company's new external auditor, BDO, found "[m]aterial weaknesses regarding management's failure to design and maintain internal control over financial reporting."  In particular, BDO found that Magnum Hunter lacked an effective control environment to meet the Company's growth, and found material weaknesses concerning the Company's: (i) financial reporting; (ii) leasehold property costs; (iii) complex accounting issues; and (iv) income taxes.  The 2012 Form 10-K also disclosed that on April 26, 2013, the SEC informed Magnum Hunter that it had commenced an inquiry into, among other matters: (i) certain of the Company's SEC filings and press releases; (ii) the sufficiency of

Magnum Hunter's internal controls; and (iii) the Company's decisions to change external auditors from Hein to PwC, and from PwC to BDO.  As a result, the 2012 Form 10-K noted that the Company may have to restate its historical consolidated financial statements and amend prior filings with the SEC, and may incur significant fees, costs, civil penalties, and fines.  The 2012 Form 10-K stated in relevant part:

> *A pending SEC inquiry and pending third-party litigation may divert the attention of management and other important resources, may expose us to negative publicity and could have a material adverse effect on our business, financial condition, results of operations and cash flows.*

> As further described in "Item 3. Legal Proceedings," on April 26, 2013, we were advised by the staff of the SEC Enforcement Division that *the SEC had commenced an inquiry into matters disclosed in certain of our SEC filings and press releases, as well as the sufficiency of our internal controls and our decisions to change auditors from Hein & Associates LLP to PricewaterhouseCoopers LLP, or PwC, and from PwC to BDO USA, LLP, among other matters*. This inquiry is ongoing and we are cooperating with the SEC in connection with these matters. *We may incur significant professional fees and other costs in responding to the SEC inquiry. If the SEC were to conclude that enforcement action is appropriate, we could be required to pay substantial civil penalties and fines. The SEC also could impose other sanctions against us or certain of our current and/or former directors and officers. Any of these events could have a material adverse effect on our business, financial condition, results of operations or cash flows. Further, there is a risk that we may have to restate our historical consolidated financial statements, amend prior filings with the SEC or take other actions not currently contemplated in connection with the SEC inquiry.*

*   *   *

**Item 9A.** ***CONTROLS AND PROCEDURES***

*   *   *

*Effective Control Environment to Meet the Company's Growth*

> •   In certain areas the Company did not have sufficient personnel with an appropriate level of knowledge, experience and training commensurate with the growth of the Company's corporate structure and financial reporting requirements. The Company did not effectively establish controls, and upgrade resources around internal audit, tax, financial reporting and certain accounting areas. Adequate controls were

- 55 -

not designed and in place to achieve operating effectiveness thereby resulting in the aforementioned deficiency. The Company did not establish effective controls over risk assessments commensurate with the growth of the Company's corporate structure and financial reporting requirements. Specifically, the Company did not have adequate processes to evaluate and scope business and information technology risks. This deficiency resulted in either not having adequate controls designed and in place or not achieving the intended operating effectiveness of controls.

- The Company did not design or maintain effective controls for its wholly-owned subsidiary, Magnum Hunter Production, Inc. (MHP), specifically around segregation of duties and timeliness of reporting with respect to revenue, joint interest, partnership accounting, and division of interests.

These material weaknesses above also contributed to the material weaknesses described below.

*Financial Reporting*

- The Company did not maintain effective controls over the recording and retention of journal entry support. The Company did not maintain effective monitoring of controls to ensure that journal entries were properly prepared with sufficient supporting documentation or were reviewed and approved to ensure the accuracy and completeness of the journal entries.

- The Company did not maintain effective controls over financial statement disclosures to ensure completeness and accuracy of condensed consolidating guarantor financial statement footnote information for the nine-month period ended September 30, 2012. The Company was unable to demonstrate remediation of this deficiency as of December 31, 2012, as the control require at least two quarters for remediation testing.

- The Company did not maintain effective controls over the quarterly and annual financial reporting processes, with respect to preparation, review, supervision, and monitoring of accounting operations. The Company did not maintain effective controls over reconciliation of certain accounts and timely preparation and review of quarterly financial information.

- The Company did not design or maintain effective controls over the recording of capitalized interest regarding the recorded costs of pipeline assets and were understated in prior quarters for interest costs for debt related to assets under construction that had not been placed in service.

- The Company did not design effective controls over share-based compensation expense, which was recorded in the Company's general and administrative expenses. The Company did not design effective controls related to the review of supporting details, including the accuracy of the volatility inputs and calculations and the manual journal entries for share-based compensation expense. This control deficiency resulted in a misstatement of the Company's general and administrative expense and share-based compensation related disclosures for the three and six-month periods ended June 30, 2012 and resulted in the restatement of the financial statements for such fiscal periods, and resulted in revised condensed consolidated financial statements for the three-and nine-month periods ended September 30, 2012. The Company was unable to demonstrate remediation of this deficiency as there were not enough transactions to test for remediation as of December 31, 2012.

*Leasehold Property Costs*

- The Company did not design effective controls to provide reasonable assurance over the accuracy and completeness of master files of lease records. The Company did not have effective controls over the allocation of leasehold property costs due to unreliable supporting lease and property records.

- The Company did not maintain effective controls over completeness and accuracy of the well acreage data resulting in inaccurate transfers of leasehold property costs during the year.

- The Company did not have effective controls over review of properties for expirations and impairments of unproven acreage, as events were not properly considered that affected the value of leases.

- The Company did not maintain adequate supporting documentation or effective controls over the review of changes to division of interest records.

*Complex Accounting Issues*

- The Company did not design an effective control environment over complex equity instruments including convertible preferred stock and related arrangements. This material weakness resulted in the restatement of the Company's Series A Convertible Preferred Units of Eureka Hunter Holdings, LLC, the Company's preferred stock embedded derivative liabilities, and the loss on derivatives and related disclosures for the three and six-month periods ended June 30, 2012. This issue also resulted in adjustments to the Company's condensed consolidated financial statements for the three-and nine-month periods ended September 30, 2012. The Company was unable to demonstrate remediation of this deficiency as of

December 31, 2012 as the control requires at least two quarters for remediation testing.

*Tax*

- The Company did not design or maintain effective controls over income tax accounting, specifically related to the accuracy of the net operating loss deduction carryover disclosed in the Company's financial statements.

90. All told, the Individual Defendants' misconduct has devastated the Company, wiping out more than $571.3 million of market capitalization, or 57.54%, from the recent high of $993 million on February 22, 2012.

## IX.   REASONS THE STATEMENTS WERE IMPROPER

91. The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    the Company had blatantly inadequate internal accounting;

(b)    through July 2012, Magnum Hunter retained the services of an external auditor that was unable to keep pace with the Company's tremendous growth;

(c)    the Company and PwC were in disagreement over several aspects of the Company's accounting practices;

(d)    PwC was unwilling to sign off on Magnum Hunter's 2012 Form 10-K; and

(e)    as a result of the foregoing, the Individual Defendants' representations concerning the Company's business and growth prospects were improper, and Magnum Hunter's financial statements were inaccurate and not in accordance with GAAP.

## X.  DAMAGES TO MAGNUM HUNTER CAUSED BY THE INDIVIDUAL DEFENDANTS

92.     As a result of the Individual Defendants' improprieties, Magnum Hunter disseminated improper, public statements concerning the Company's business prospects and financial controls.  These improper statements have devastated Magnum Hunter's credibility as reflected by the Company's over $571.3 million, or 57.5%, market capitalization loss.  Further, based on PwC's initial audit, the Company's repeated delays in filing its 2012 Form 10-K, and the ongoing SEC inquiry, it appears that Magnum Hunter may be forced to restate several past financial statements that were previously audited by Hein.

93.     Moreover, as a direct and proximate result of the Individual Defendants' misconduct, Magnum Hunter has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from the Company's internal review of the accounting violations;

(b)     costs incurred from transitioning between external auditors;

(c)     costs incurred from re-auditing past financial statements;

(d)     costs incurred from restating past financial statements;

(e)     costs incurred from defending and paying any settlement in the Securities Class Actions for violations of federal securities laws;

(f)     costs incurred in responding to the SEC inquiry;

(g)     civil penalties, fines, and/or sanctions that may be imposed by the SEC pending the conclusion of its inquiry; and

(h)     costs incurred from the compensation and benefits paid to the defendants that breached their fiduciary duties to the Company.

94.     Moreover, these actions have irreparably damaged Magnum Hunter's corporate image and goodwill with its business partners, regulators, and shareholders.  For at least the foreseeable future, Magnum Hunter will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Magnum Hunter's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## XI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

95.     Plaintiff brings this action derivatively in the right and for the benefit of Magnum Hunter to redress injuries suffered, and to be suffered, by Magnum Hunter as a direct result of violations of section 14(a) of the Exchange Act, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Magnum Hunter is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

96.     Plaintiff will adequately and fairly represent the interests of Magnum Hunter in enforcing and prosecuting its rights.

97.     Plaintiff was a shareholder of Magnum Hunter at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Magnum Hunter shareholder.

98.     The current Board of Magnum Hunter consists of the following nine individuals: defendants Evans, Ormand, Bailes, Bynum, Hurley, McClaugherty, Carrillo, Pfeifer, and Swanson.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**A.    Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment**

99.    The Director Defendants' challenged misconduct at the heart of this case constitutes the direct facilitation of violations of applicable law, including knowingly and consciously presiding over the Company's systematic violations of GAAP, as well as actively covering up this misconduct through participation in the materially improper statements.  As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread violations of applicable law, including the rampant manipulation of the Company's financial statements.  Breaking the law is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment.  Accordingly, demand on the Board is excused.

100.    The length of time and the scope of the wrongdoing occurring at the Company concerning its improper accounting manipulation makes it implausible to suggest that the Board would not be aware of the wrongdoing if its members were fulfilling their fiduciary duties.  This is particularly true since the Board was already on alert about the Company's material deficiencies in its internal controls as a result of: (i) the Company's complete absence of internal accounting and financial controls from at least 2009 through most of 2011; (ii) the Company's inadequate internal accounting services that were performed by GreenHunter, a company with various interests that conflicted with its ability to adequately fulfill its accounting duties; (iii) the Company's extended engagement of Hein after it was apparent that Hein lacked adequate resources to keep up with the Company's rapid growth; (iv) the numerous internal controls issues identified by PwC; and (v) the Company having filed multiple corrections to its SEC filings throughout 2012.  The Board's tacit or express approval of the illegal actions occurring at the

Company could not have been the result of a fully informed business decision taken with the requisite due care.  Therefore demand is excused.

### B.   Demand Is Excused Because Each Member of the Board Faces a Substantial Likelihood of Liability for Their Misconduct

101.    Defendants Evans, Ormand, Bailes, Bynum, Carrillo, Hurley, McClaugherty, Pfeifer, and Swanson violated federal securities laws by at least negligently approving false and misleading statements to shareholders that were contained in the 2012 Proxy, including with respect to the Company's ability to properly evaluate its financial performance and grant incentive based stock awards to the Company's officers, directors, and employees.  Moreover, these defendants also breached their fiduciary duties of loyalty and good faith by making improper statements in one or more of the Company's Forms 10-K and/or 10-Q.  For example, each of the above defendants signed the Company's 2011 Form 10-K which: (i) falsely touted the Company's fourth quarter and fiscal 2011 financial results; (ii) falsely stated that Company had effective internal financial controls; and (iii) failed to disclose that Hein lacked the resources to keep pace with the Company's explosive growth.  These statements were improper because they knowingly or recklessly misstated and/or omitted material, adverse facts concerning the Company's financial performance and condition, as well as the effectiveness of Company's internal controls.

102.    In addition to the above, defendant Evans is at least grossly negligent in making false or misleading statements in numerous press releases and SEC filings throughout 2012 and 2013.  Thus, the current Board faces a substantial likelihood of liability for its violation of federal securities laws and breaches of fiduciary duties.

103.    Further, defendants Bailes, Bynum, Hurley, and McClaugherty were members of the Audit Committee during at least 2011 and 2012.  Under the Audit Committee's Charter, these

defendants had a heightened duty to supervise: (i) the integrity of the financial statements of the Company; (ii) the effectiveness of the external auditors; (iii) the Company's compliance with legal, regulatory, and ethical requirements; and (iv) the Company's system of internal controls and procedures, including disclosure controls and procedures.  Thus, defendants Bailes, Bynum, Hurley, and McClaugherty were responsible for overseeing and directly participating in the Company's numerous accounting violations.  Despite their knowledge of the wrongdoing alleged herein, Audit Committee Defendants, Bailes, Bynum, Hurley, and McClaugherty, knowingly or recklessly approved of the dissemination of false or misleading statements related to the Company's earnings guidance and financial and disclosure controls.  Defendants Bailes, Bynum, Hurley, and McClaugherty also utterly failed to ensure the effectiveness of the external auditors or the adequacy of the Company's disclosure controls and procedures.   More, the Audit Committee Defendants refused to work with PwC to address and remedy numerous issues that would likely have had a material impact on the fairness or reliability of Magnum Hunter's previously reported consolidated financial reports.  Instead, when PwC identified the issues, the Audit Committee Defendants dismissed PwC before it had a chance to finish its audit, and the Director Defendants unanimously ratified and approved the Audit Committee's decision.  The Audit Committee Defendants further made false or misleading statements in the Form 8-K announcing PwC's dismissal, including failing to disclose that PwC specifically advised them of information that PwC concluded materially impacts the fairness or reliability of the Company's consolidated financial statements, and that this issue was not resolved to PwC's satisfaction prior to its dismissal.  Accordingly, defendants Bailes, Bynum, Hurley, and McClaugherty face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.  The Director Defendants also face a substantial likelihood of liability for breaching their

fiduciary duties by unanimously ratifying and approving the Audit Committee's decision to dismiss PwC.

104.     Moreover, despite having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Magnum Hunter for any of the wrongdoing alleged by plaintiff herein.

105.     Plaintiff has not made any demand on the other shareholders of Magnum Hunter to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Magnum Hunter is a publicly held company with over 169.6 million shares outstanding and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## XII.   COUNT I - AGAINST THE DIRECTOR DEFENDANTS FOR VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT

106.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.     Director Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading statements to shareholders that were contained in the 2012 Proxy.  The 2012 Proxy contained proposals to Magnum Hunter's shareholders that they vote to approve an amended and restated stock incentive plan to increase the aggregate number of shares of Magnum Hunter common stock that may be issued under the stock incentive plan by 7.5

million shares.  The 2012 Proxy further stated that the increased number of shares would be used to compensate officers and directors for their performance, including with respect to the Company's performance as a whole.

108.    The 2012 Proxy, however, misrepresented and failed to disclose material information, including that the Company lacked adequate internal controls to properly assess various financial metrics or otherwise determine whether the officers and directors were meeting their performance goals.

109.    The Director Defendants were at least negligent in filing the 2012 Proxy with these materially false and misleading statements.

110.    The omissions and false and misleading statements in the 2012 Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on an increase in the issuance of incentive based stock which would be used to provide improper bonuses to certain of its executive officers and directors that breached their fiduciary duty or otherwise harmed the Company.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2012 Proxy and in other information reasonably available to shareholders.

111.    By reason of the foregoing, the Director Defendants have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

112.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2012 Proxy as described herein.

## XIII.    COUNT II - AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

113.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114.    The Individual Defendants owed and owe Magnum Hunter fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Magnum Hunter the highest obligation of good faith, fair dealing, loyalty, and due care.

115.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Magnum Hunter, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

116.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) the Company had woefully inadequate internal controls; (ii) the Company's internal accounting lacked the requisite personnel and sophistication to adequately perform its accounting duties; (iii) the Company's external auditor lacked the necessary resources to adequately fulfill its external audit duties commensurate with the Company's tremendous growth; and (iv) the Company's public statements concerning is financial prospects and internal controls were false and misleading.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

117.    Director Defendants Evans, Ormand, Bailes, Bynum, Hurley, McClaugherty, Carrillo, Pfeifer, and Swanson, as directors of the Company, owed Magnum Hunter the highest duty of loyalty.   These defendants breached their duty of loyalty by issuing or recklessly permitting the Company to issue false and misleading statements.  Defendants Evans, Ormand, Bailes, Bynum, Hurley, McClaugherty, Carrillo, Pfeifer, and Swanson knew or were reckless in

not knowing that: (i) the Company had woefully inadequate internal controls; (ii) the Company's internal accounting lacked the requisite personnel and sophistication to adequately perform its accounting duties; (iii) the Company's external auditor lacked the necessary resources to adequately fulfill its external audit duties commensurate with the Company's tremendous growth; and (iv) the Company's public statements concerning is financial prospects and internal controls were false and misleading.  Accordingly, defendants Evans, Ormand, Bailes, Bynum, Hurley, McClaugherty, Carrillo, Pfeifer, and Swanson breached their duty of loyalty to the Company.

118.    The Audit Committee Defendants, Bailes, Bynum, Hurley, and McClaugherty, breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and defendants Bailes, Bynum, Hurley, and McClaugherty failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.  Defendants Bailes, Bynum, Hurley, and McClaugherty also utterly failed to ensure the effectiveness of the external auditors or the adequacy of the Company's disclosure controls and procedures, as required by the Audit Committee Charter in effect at the time.  Accordingly, defendants Bailes, Bynum, Hurley, and McClaugherty breached their duty of loyalty to the Company.

119.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Magnum Hunter has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

120.    Plaintiff, on behalf of Magnum Hunter, has no adequate remedy at law.

## XIV.   COUNT III - AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

121.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122.    As a result of the decision to cause or allow the Company operate in an environment devoid of adequate internal and financial controls, the Individual Defendants have caused Magnum Hunter to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

123.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

124.    Plaintiff, on behalf of Magnum Hunter, has no adequate remedy at law.

## XV.   COUNT IV - AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Magnum Hunter.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Magnum Hunter.

127.    Plaintiff, as a shareholder and representative of Magnum Hunter, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

128.    Plaintiff, on behalf of Magnum Hunter, has no adequate remedy at law.

## XVI.   PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Magnum Hunter, demands judgment as follows:

A.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violations of section 14(a) of the Exchange Act, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing Magnum Hunter to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Magnum Hunter and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)      a proposal to ensure the adequacy of the qualifications of Magnum Hunter's directors, executives, and other employees;

(ii)      a proposal to ensure appropriate controls are in place to prevent self-dealing by Magnum Hunter's directors, executives, and other employees;

(iii)      a proposal to appropriately test and then strengthen the Company's internal control functions and disclosure oversight procedures;

(iv)      a proposal to ensure the appointment of adequately qualified internal accounting and internal and external auditing;

(v)      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

(vi)     a provision to permit the shareholders of Magnum Hunter to nominate at least three candidates for election to the Board;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Magnum Hunter has an effective remedy;

D.     Awarding to Magnum Hunter restitution from these defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## XVII.  JURY DEMAND

Plaintiff demands a trial by jury.

Dated: June 27, 2013                                THE WARNER LAW FIRM
                                                    PAUL T. WARNER


                                                    _s/Paul T. Warner_
                                            _____
                                                    PAUL T. WARNER

                                            SBN 00791884
                                            SDTXBN: 25143
                                            11123 McCracken Circle, Suite A
                                            Cypress, TX  77429
                                            Telephone: (281) 664-7777
                                            Facsimile: (281) 664-7774
                                            pwarner@warner-law.net

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
GEORGE C. AGUILAR
MICHAEL J. NICOUD
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
gaguilar@robbinsarroyo.com
mnicoud@robbinsarroyo.com

Attorneys for Plaintiff